UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GARY J. ZENTNER, as Trustee of the GARY J. ZENTNER and ROBIN C. ZENTNER TRUST, on behalf of himself and all others similarly situated, and Derivatively on behalf of FALCON PLUS STRATEGIES LLC,<br><br>               Plaintiff,<br><br>        v.<br><br>CITIGROUP INC., CITIGROUP ALTERNATIVE INVESTMENTS LLC, CITIGROUP GLOBAL MARKETS INC., FALCON PLUS STRATEGIES LLC, FALCON PLUS LLC, FALCON STRATEGIES TWO LLC, and AMACAR GP, INC., DONALD LUCARDI, and REAZ ISLAM,<br><br>               Defendants. | CASE NO <br><br><br><br>__NOTICE OF REMOVAL__<br><br> |

PLEASE TAKE NOTICE THAT, pursuant to 28 U.S.C. §§ 1332, 1367, 1441, 1446, and 1453, defendants Citigroup Inc., Citigroup Alternative Investments LLC, Citigroup Global Markets Inc., Falcon Plus Strategies LLC, Falcon Plus LLC, Falcon Strategies Two LLC, AMACAR GP, Inc. and Donald Lucardi (collectively, "Citigroup Defendants") and defendant Reaz Islam ("Islam"), by their undersigned attorneys, submit this Notice of Removal from the Supreme Court of the State of New York, New York County, in which the above-captioned case is now pending, to the United States District Court for the Southern District of New York and, in support of said notice, state as follows:[1]

---

[1] In filing this Notice of Removal, the Citigroup Defendants and Islam do not waive any defenses that may be available to them.

## NATURE OF THE ACTION

1.    This action, styled *Gary J. Zentner, as Trustee of the Gary J. Zentner and Robin C. Zentner Trust, on behalf of himself and all others similarly situated, and Derivatively on behalf of Falcon Plus Strategies LLC* v. *Citigroup Inc., Citigroup Alternative Investments LLC, Citigroup Global Markets Inc., Falcon Plus Strategies LLC, Falcon Plus LLC, Falcon Strategies Two LLC, and AMACAR GP, Inc., Donald Lucardi, and Reaz Islam*, Index No. 08601711, was filed in the Supreme Court of the State of New York, County of New York, on June 6, 2008.

2.    Pursuant to 28 U.S.C. § 1446(a), a copy of the Complaint and summons are attached hereto as Exhibit A.

## THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE CLASS ACTION FAIRNESS ACT

3.    Plaintiff's putative class action fits squarely within the definition of federal diversity jurisdiction as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified as amended in scattered sections of 28 U.S.C.) ("CAFA"), in that it is:  (i) a putative class action; (ii) with "minimal diversity"; (iii) no fewer than 100 members; and (iv) at least $5,000,000 in controversy.  *Blockbuster, Inc.* v. *Galeno*, 472 F.3d 53, 57 (2d Cir. 2006); *Mattera* v. *Clear Channel Commc'ns, Inc.*, 239 F.R.D. 70, 78 (S.D.N.Y. ).

**A.    Class Action**

4.    A "class action" is defined by CAFA as any civil action filed under Fed. R. Civ. P. 23 or "similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action."  28 U.S.C. § 1332(d)(1)(B).

5.      Plaintiff's lawsuit meets the definition of "class action" under 28 U.S.C. § 1332(d)(1)(B) because it was filed under the class action provision of the New York Civil Practice Law and Rules, N.Y. C.P.L.R. § 901.  (*See* Compl. ¶ 67.)

**B.      *Diversity of Citizenship***

6.      Pursuant to CAFA, a district court has original jurisdiction of any civil action in which "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).

7.      For the purposes of diversity jurisdiction, the citizenship of a corporation is defined as "any State by which [a corporation] has been incorporated and of the State where it has its principal place of business." *Id.* § 1332(c)(1).

8.      For the purposes of diversity jurisdiction, the citizenship of an unincorporated association, including a limited liability company, is defined by CAFA as "the State where [an unincorporated association] has its principal place of business and the State under whose laws it is organized." *Id.* § 1332(d)(10).

9.      For the purposes of diversity jurisdiction, the citizenship of an individual depends on his or her domicile. *See, e.g.*, *Linardos* v. *Fortuna*, 157 F.3d 945, 948 (2d Cir.1998) (citing *Gilbert* v. *David*, 235 U.S. 561, 569 (1915)).

10.      The citizenship of the defendants is as follows:

- Defendant Citigroup Inc. is a Delaware corporation with its principal place of business in New York.

- Defendant Citigroup Alternative Investments LLC is a Delaware company with its principal place of business in New York.

- Defendant Citigroup Global Markets Inc. is a New York corporation with its principal place of business in New York.

3

- Defendants Falcon Plus Strategies LLC, Falcon Plus LLC, and Falcon Strategies Two LLC (collectively, the "Falcon Funds") are all Delaware companies with their principal places of business in New York.

- Defendant AMACAR GP, Inc. is a Delaware corporation with its principal place of business in North Carolina.

- Defendant Donald Lucardi was and is domiciled in the state of New York, where his address is 252 Seventh Avenue #15C, New York, New York 10001.

- Defendant Reaz Islam was and is domiciled in the state of New York, where his address is 98-05 70th Avenue, Forest Hills, New York 11375.

11.    Upon information and belief, Plaintiff Gary J. Zentner ("Plaintiff" or "Zentner") was and is domiciled in the state of Pennsylvania, where his address is 3 Couch Farm Road, Pittsburgh, Pennsylvania.  (*See* Compl. ¶ 18.)

12.    Because Plaintiff is a citizen of Pennsylvania and none of the defendants is a citizen of that state, diversity of citizenship is established for the purposes of CAFA.

## C.    *Number of Proposed Class Members*

13.    The provisions of 28 U.S.C. § 1332(d)(2), only apply if "the number of members of all proposed plaintiff classes in the aggregate" is greater than 100.  28 U.S.C. § 1332(5)(B).

14.    Plaintiff alleges "that there are thousands of members of the Class." (Compl. ¶ 70.)  Therefore, satisfaction of this requirement is not in dispute.  *See Blockbuster, Inc.*, 472 F.3d at 57.

**D.    Amount in Controversy**

15.    Under CAFA, a district court has "original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs . . . ." 28 U.S.C. § 1332(d)(2).

16.    In determining the amount in controversy, "the claims of the individual class members shall be aggregated." *Id.* § 1332(d)(6).

17.    There are at least 100 class members, (*see* ¶ 14, *supra*), and each class member was required to invest no less than $500,000 in the Falcon Funds. The class members' aggregate investment therefore exceeds $50,000,000.

18.    Since shares of the Falcon Funds were issued, the aggregate value of the shares has declined by more than 50 percent. The aggregate decrease in value of the class members' shares is therefore likely to be an amount in excess of $25,000,000.

19.    It is therefore more likely than not that the amount in controversy in this action exceeds $5,000,000. *See, e.g., Blockbuster, Inc.,* 472 F.3d at 58 (applying a "reasonable probability" standard); *Mattera,* 239 F.R.D. at 78 (applying a "preponderance of the evidence" standard).

**E.    None of the Securities Related Exceptions of 28 U.S.C. 1332(d)(9) Applies**

20.    Plaintiff's lawsuit is not within the "covered securities" exception of 28 U.S.C. § 1332(d)(9)(A) because shares of the Falcon Funds are not covered securities as defined under section 16(f)(3) of the Securities Act of 1933, 15 U.S.C. § 77p(f)(3),[2] and section 28(f)(5)(E) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(f)(5)(E). *See* 28 U.S.C. §

---

[2]    Although § 1332(d)(9)(A) refers to "15 U.S.C. § 78p(f)(3)," it is likely that the reference is meant to be to 15 U.S.C. § 77p(f)(3).

1332(d)(9)(A).  Specifically, shares of the Falcon Funds are not nationally traded securities, nor are they registered under the Investment Company Act of 1940, 15 U.S.C. § 80a-1 *et seq.*

21.    Plaintiff's lawsuit is not within the "internal affairs or governance" exception of 28 U.S.C. § 1332(d)(9)(B) because Plaintiff is asserting claims related to the marketing and solicitation of investment in the securities.  (*See, e.g.*, Compl. ¶¶ 79-93.)

22.    Plaintiff's lawsuit is not within the exception of 28 U.S.C. § 1332(d)(9)(C) as to claims solely involving "the rights, duties . . . and obligations relating to or created by or pursuant to any security," because Plaintiff's claims are based on the marketing of the securities and not the terms of those securities.  (*See, e.g.*, Compl. ¶¶ 5, 32-35, 31a-34a,[3] 79-93.)  *See Estate of Pew* v. *Cardarelli*, No. 06-5703-mv, 2008 WL 2042809, at *6 (2d Cir. May 13, 2008) (holding that the § 1332(d)(9)(C) exception encompasses claims grounded in the terms of the security itself and not claims of fraudulent marketing).

**F.    *None of the Other CAFA Exceptions Applies***

23.    The party opposing removal jurisdiction has the burden of proof as to the applicability of either the discretionary or mandatory exceptions of §§ 1332(d)(3) and (4).  *See, e.g.*, *Brook* v. *UnitedHealth Group Inc.*, No. 06 CV 12954(GBD), 2007 WL 2827808, at *3 (S.D.N.Y. Sept. 27, 2007); *Mattera*, 239 F.R.D. at 79.

24.    Without conceding that they have the burden of proof with respect to the applicability of the exceptions contained in §§ 1332(d)(3) and (4), the Citigroup Defendants and Islam assert that none of these exceptions applies because:

---

[3]    The paragraphs in the Complaint appear to be misnumbered—following Paragraph 35 is another Paragraph 31.  The result is that there are two sets of paragraphs numbered 31 through 35.  For the purposes of this Notice of Removal, the Citigroup Defendants and Islam will refer to the second set of paragraphs numbered 31 through 35 as Paragraphs 31a-35a.

- Less than one-third of the members of all proposed plaintiff classes in the aggregate are citizens of the State of New York. *See* 28 U.S.C. § 1332(d)(4).

- The primary defendants are not all citizens of the State of New York (*see* ¶ 10, *supra*). *See id.* §§ 1332(d)(3)-(4); *Brook*, 2007 WL 2827808, at *6 (considering all defendants to be "primary defendants" where plaintiff seeks to hold them jointly and severally liable).

- Due to the geographic diversity of the proposed plaintiff class, as alleged in the Complaint (*see* Compl. ¶ 69), "principle injuries resulting from the alleged conduct or any related conduct of each defendant" were not incurred in the State of New York. *See* 28 U.S.C. § 1332(d)(4)(A); *Brook*, 2007 WL 2827808, at *4 (quoting *Mattera*, 239 F.R.D. at 80) ("[T]he principle injuries suffered by the class must be limited to a particular state; it does not apply to cases in which the defendants engaged in conduct that 'could be alleged to have injured [persons] throughout the country or broadly throughout several states.'").

- During the three-year period preceding the filing of this action, at least one other class action has been filed asserting the same or similar factual allegations against many of the same defendants. *See* 28 U.S.C. § 1332(d)(4)(A). Specifically, on April 4, 2008, well within the three-year period preceding the June 6, 2008 filing of this case, *Zeff* v. *Citigroup Alternative Investments LLC, et al.*, Case No. 08-80346-Civ-ZLOCH/SNOW (S.D. Fla.) ("*Zeff*") was filed. The *Zeff* complaint asserted similar factual allegations on behalf of a proposed class of investors in the Falcon Strategies Two B LLC Hedge Fund. *See Zeff* complaint (attached hereto as Exhibit B). Many of the same defendants were named in the *Zeff* complaint, including Citigroup Alternative Investments LLC and

Citigroup Inc.[4] *See id.* In addition, on May 20, 2008, *Ferguson Family Trust* v. *Falcon Strategies Two LLC, et al.*, Case No. 08 CIV 4723 (S.D.N.Y.) ("*Ferguson*"), was filed. The *Ferguson* complaint asserts related factual allegations pertaining to a tender offer for shares of Falcon Strategies Two LLC. *See Ferguson* complaint (attached hereto as Exhibit C). Many of the same defendants are named in the *Ferguson* complaint, including Falcon Strategies Two LLC, AMACAR GP, Inc., Citigroup Alternative Investments LLC, Citigroup Inc. and Reaz Islam. *See id.*

**G.    *This Court Has Supplemental Jurisdiction Over Those Claims Not Within the Subject Matter Jurisdiction Conferred by CAFA***

25.    Those claims in the Complaint over which this Court does not have original jurisdiction, pursuant to 28 U.S.C. § 1332(d)(2), "form part of the same case or controversy." 28 U.S.C. § 1367.

26.    This Court therefore has supplemental jurisdiction over all other claims in the Complaint.

## THE PROCEDURAL REQUIREMENTS FOR REMOVAL HAVE BEEN SATISFIED

27.    This action is removable to this Court pursuant to 28 U.S.C. § 1441(a) because there is original jurisdiction and the Southern District of New York embraces the place where the state court action is currently pending.

28.    This Notice of Removal is timely under 28 U.S.C. § 1446(b) as it has been filed within thirty days of the date on which a copy of the complaint was received by the

---

[4]    The *Zeff* complaint was dismissed without prejudice on May 14, 2008, following the submission of a Notice of Voluntary Dismissal by the plaintiff. *See* Final Order of Dismissal, *Zeff* v. *Citigroup Alternative Investments LLC, et al.*, Case No. 08-80346-CIV-ZLOCH (S.D. Fla. May 14, 2008).

Citigroup Defendants and Islam. As of the date of this Notice of Removal, upon information and belief, the defendants that had been served with the summons and Complaint were as follows:

- Citigroup Inc., Citigroup Alternative Investments LLC and Citigroup Global Markets Inc. were served on June 25, 2008;

- Falcon Plus Strategies LLC was served on June 26, 2008; and

- AMACAR GP, Inc. was served on June 30, 2008.

29.     This Notice of Removal is also appropriate under 28 U.S.C. § 1453(b), which provides that "[a] class action may be removed to a district court of the United States in accordance with section 1446 . . . without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants." *Id.* The exceptions contained in § 1453(d) do not apply for the same reasons that the exceptions contained in § 1332(d)(9) do not apply (*see* ¶¶ 20-22, *supra*). *See id.* § 1453(d).

30.     The information required pursuant to Local Civil Rule 81.1(a) has been provided (*see* ¶¶ 10-11 & 28, *supra*).

31.     Written notice of this filing will be provided to all adverse parties, and a copy of this Notice of Removal will be filed in the appropriate State court, as required by 28 U.S.C. § 1446(d).

32.     Pursuant to 28 U.S.C. § 1446(a) and Local Civil Rule 81.1(b), a copy of the Complaint and summons are attached hereto as Exhibit A.

WHEREFORE, the above described action now pending against the Citigroup Defendants and Islam in the Supreme Court of the State of New York, County of New York, is properly removed to this Court.

Dated:  July 2, 2008
        New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP


By: *Charles E. Davidow*

Brad S. Karp
Michael E. Gertzman
Kristy Tillman
1285 Avenue of the Americas
New York, New York  10019-6064
Tel.    (212) 373-3000
Fax    (212) 757-3980
bkarp@paulweiss.com
mgertzman@paulweiss.com
ktillman@paulweiss.com

Charles E. Davidow
1615 L Street, N.W.
Washington, D.C. 20036-5694
Tel.    (202) 223-7300
Fax    (202) 223-7420
cdavidow@paulweiss.com

*Attorneys for Defendants Citigroup Inc.,
Citigroup Alternative Investments LLC,
Citigroup Global Markets Inc., Falcon Plus
Strategies LLC, Falcon Plus LLC, Falcon
Strategies Two LLC, AMACAR GP, Inc.
and Donald Lucardi*

ARKIN KAPLAN RICE LLP

By: _____

Sean R. O'Brien
590 Madison Avenue, 35th Floor
New York, New York
Tel.    (212) 333-0200
Fax    (212) 333-2350
sobrien@arkin-law.com

*Attorneys for Defendant Reaz Islam*

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------------x

GARY J. ZENTNER, as Trustee of the GARY J. ZENTNER
and ROBIN C. ZENTNER TRUST, on behalf of himself
and all others similarly situated, and Derivatively on behalf
of FALCON PLUS STRATEGIES LLC,

Plaintiffs,

Index No:

-against-

CITIGROUP, INC., CITIGROUP ALTERNATIVE
INVESTMENTS, LLC, CITIGROUP GLOBAL
MARKETS, INC., FALCON PLUS STRATEGIES
LLC, FALCON PLUS LLC, FALCON STRATEGIES TWO,
LLC, and AMACAR GP, INC., DONALD LUCARDI,
and REAZ ISLAM

**SUMMONS**

08601711

Defendants.

-------------------------------------------------------------------------x

**You are hereby summoned** to answer the complaint in this action and to
serve a copy of your answer, or, if the complaint is not served with this summons,
to serve a notice of appearance, on the Plaintiff's Attorney(s) within 20 days after
the service of this summons, exclusive of the day of service (or within 30 days
after the service is complete if this summons is not personally delivered to you
within the State of New York); and in case of your failure to appear or answer,
judgment will be taken against you by default for the relief demanded in the
complaint.

Dated: June 6, 2008
New York, NY

BRAGAR WEXLER EAGEL & SQUIRE, PC

By:

Lawrence P. Eagel
885 Third Avenue – Suite 3040
New York, NY 10022
(212) 308-5858
Co-Counsel for Lead Plaintiff

FILED
JUN 06 2008
COUNTY CLERK'S OFFICE
NEW YORK

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------x
GARY J. ZENTNER, as Trustee of the GARY J. ZENTNER
and ROBIN C. ZENTNER TRUST, on behalf of himself
and all others similarly situated, and Derivatively on behalf
of FALCON PLUS STRATEGIES LLC,

                              Plaintiffs,                    Index No:

              -against-

CITIGROUP, INC., CITIGROUP ALTERNATIVE            **08601711**
INVESTMENTS, LLC, CITIGROUP GLOBAL
MARKETS, INC., FALCON PLUS STRATEGIES
LLC, FALCON PLUS LLC, FALCON STRATEGIES TWO,
LLC, AMACAR GP, INC., DONALD LUCARDI,
and REAZ ISLAM

                              Defendants.
-----------------------------------------------------------------------x

### CLASS ACTION AND DERIVATIVE COMPLAINT

Plaintiff, GARY J. ZENTNER, as Trustee of the GARY J. ZENTNER and

ROBIN C. ZENTNER TRUST (the "Trust"), on behalf of himself and all others

similarly situated ("Lead Plaintiff"), by and through his counsel, Silverman Acampora

LLP and Bragar Wexler Eagel & Squire, P.C., for his complaint against defendants

Citigroup, Inc., Citigroup Alternative Investments, LLC, Citigroup Global Markets,

Inc., Falcon Plus Strategies LLC, Falcon Plus LLC, Falcon Strategies Two LLC,

AMACAR GP, Inc., Donald Lucardi, and Reaz Islam (collectively referred to as

"Defendants") allege as follows:

### NATURE OF THE ACTION

1.      This action is brought on behalf of all investors in Falcon Plus

Strategies LLC ("FPS"), who purchased their interest between September 2, 2007

1

JSH/D266269w/F055307

and December 31, 2007 (the "Class Period)". Plaintiff seeks damages for (a) negligent misrepresentation and common law fraud under New York law; (b) breach of fiduciary duties and gross negligence resulting in the financial devastation suffered by innocent investors in FPS; and (c) derivatively on behalf of FPS.

2.    The objective of FPS was to invest substantially all of its assets in Falcon Plus LLC ("Falcon Plus") which, in turn, invested substantially all of its assets in Falcon Strategies Two LLC ("Falcon Two") (together with FPS and Falcon Plus, sometimes collectively the "Funds").

3.    Each of the investment vehicles was solely created, marketed, and/or managed by Citigroup, Inc., Citigroup Alternative Investments, LLC, Citigroup Global Markets, Inc., Donald Lucardi ("Lucardi"), and Reaz Islam ("Islam" and, together with Lucardi sometimes the "Individual Defendants").

4.    The objective of the Falcon Two was to seek high current income and capital appreciation, primarily through leveraged investments in investment-grade structured finance securities with an emphasis on triple-A and double-A rated structured finance securities.

5.    Defendants Citigroup, Inc. and Citigroup Global Markets, Inc. (the "Marketing Defendants") and the Individual Defendants marketed the Funds as a relatively safe investment, telling potential investors that the Funds' modest returns were consistent with its adequately hedged, relatively low-risk profile.

6.    Although the offering documents represented that Funds' managers would regularly monitor and adequately hedge risk, the managers shirked those responsibilities and failed to disclose their grossly negligent errors and/or omissions

JSH/D266269v/F055307

to investors. To the contrary, Defendants affirmatively represented and continued to represent to investors, through the end of January 2008, that the Funds were not subject to the substantial losses they ultimately incurred. The fact that the Funds were highly leveraged and invested primarily in high-risk financial instruments made it absolutely critical that the Funds' portfolio be managed with a view toward minimizing risk, and that investors be provided with accurate and timely disclosures regarding their investments.

7.      Despite their duties and responsibilities as managers of the Funds' affairs, Defendants Citigroup Alternative Investment, LLC, and AMACAR, GP, Inc., (collectively, the "Management Defendants") and the Individual Defendants abdicated their responsibilities to the Funds and their investors by failing to conduct any meaningful sensitivity analysis and by neglecting to manage the Funds in a manner that would minimize risk and control losses in connection with sub-prime mortgage-backed securities.

8.      Moreover, the Management Defendants, the Marketing Defendants, and the Individual Defendants systematically failed to disclose to investors that the Management Defendants and the Individual Defendants were not (a) sufficiently monitoring and adequately assessing the credit risk inherent in the Funds' investments; (b) determining the frequency and severity of defaults of the underlying assets of each of the structured finance securities invested in by the Funds; (c) developing and implementing credit enhancement mechanisms that would cause cash flow to be diverted away from the Funds' riskier investments under certain market conditions; and (d) otherwise adequately engaging in hedging techniques to

JSH/D266269v/F055307

minimize risk. Based upon those non-disclosures and failures to perform their duties, the Management Defendants, the Marketing Defendants, and the Individual Defendants breached their fiduciary duties to the Funds and investors in the Funds.

9.    Indeed, the Management Defendants' and the Individual Defendants' failure to sufficiently hedge risk in the Funds' portfolio is apparent, at least in part, from the Funds' precipitous decline in value in late 2007 and early 2008.

10.    At the same time that they were performing their tasks so poorly, the Management Defendants garnered more than $6.3 million in advisory fees and incentive fees with respect to Falcon Two for the year ended December 31, 2006, and more than $2.1 million for the year ended December 31, 2007.

11.    In addition, Defendants breached their fiduciary duties by their continued, affirmative representations to investors regarding the low volatility of the investments at a time when Defendants knew or should have known that the Funds were in a severe financial crisis.

12.    Had Lead Plaintiff and other investors known the truth, they would have taken steps to avoid the massive losses they suffered, either by refusing to invest, withdrawing their investments from FPS, or removing the managers.

13.    The Management Defendants' and the Individual Defendants' abdication of their responsibilities was ultimately disclosed in January 2008, when Defendants announced substantial losses incurred by the Funds.

14.    For these reasons and those set forth below, the Marketing Defendants, the Management Defendants, and the Individual Defendants violated their fiduciary duties to FPS and the investors.

4

15.    The allegations set forth herein are based upon (a) the personal knowledge and the acts of Lead Plaintiff and upon information and belief as to all other matters, and (b) the investigation conducted to date by counsel including, but not limited to, a review of the marketing and subscription materials provided to Lead Plaintiff prior to the purchase of FPS, a review of private placement memoranda pertaining to the Funds, a review of various financial statements for the Funds, a review of investor reports for the Funds, and an analysis of available news articles and reports, price history data, public filings, press releases and other matters of public record.

## JURISDICTION AND VENUE

16.    Jurisdiction is proper pursuant to CPLR § 301 because Defendants are New York domiciliaries subject to the jurisdiction of New York Courts, and/or pursuant to CPLR § 302 because Defendants transact business in, or have committed tortious acts within, the State of New York.

17.    Pursuant to CPLR § 503, venue is proper in New York County since one or more of the Defendants reside in New York County.

## PARTIES

18.    At all times relevant hereto, Plaintiff Gary J. Zentner ("Zentner") was and is a resident of the state of Pennsylvania, with an address at 3 Couch Farm Road, Pittsburgh, Pennsylvania. On or about September 25, 2007 Zentner invested $500,000 into the Falcon Plus -Series 2007-1, through Falcon Plus Strategies LLC. The Trust still holds that investment.

JSH/D266269v/F055307

19.   Defendant Citigroup, Inc., ("Citigroup") is a major American financial services company with offices at 399 Park Avenue, New York, New York.  With the exception of AMACAR GP, Inc., all of the other defendants in this case are subsidiaries or affiliates of Citigroup.

20.   At all times relevant hereto, Defendant Citigroup Alternative Investments, LLC, ("CAI") is registered with the Securities and Exchange Commission as an investment advisor and conducts business at 731 Lexington Avenue, New York, New York.

21.   Defendant Citigroup Global Markets, Inc. ("CGM") is a Delaware Corporation and is registered with the Securities and Exchange Commission as a broker-dealer.

22.   Defendant Falcon Plus is a Delaware limited liability company with offices c/o Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware.

23.   Defendant Falcon Strategies Two LLC is a Delaware limited liability company with offices c/o Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware.

24.   Defendant AMACAR GP, Inc., which is the sole managing member of Falcon Plus Strategies LLC, Falcon Plus LLC, and Falcon Strategies Two LLC, is a Delaware Corporation with offices at 6525 Morrison Boulevard, Charlotte, North Carolina.

JSH/D266269v/F055307

25.    At all times relevant hereto, Defendant Donald Lucardi was and is a Product Marketing Specialist for Citigroup Alternative Investments, LLC, with an office at 731 Lexington Avenue, New York, New York.

26.    At all times relevant hereto, Defendant Real Islam was and is a Senior Investment Officer and Head of Citi Fixed Income Alternative Investments for Citigroup Alternative Investments, LLC, with an office at 731 Lexington Avenue, New York, New York.

## BACKGROUND FACTS

27.    Lead Plaintiff became a client of Citigroup in the FPS Funds in September 2007, introduced by a broker at Solomon Smith Barney, Inc., a division and service mark of CGM.

28.    As explained to Lead Plaintiff by the Marketing Defendants and the Individual Defendants, each of the Funds was created as a vehicle for investors to gain exposure to specific segments of the fixed income markets. The goal of the Funds was to generate returns in the fixed income market consistent with a targeted level of risk/volatility while providing diversification from traditional long-only investments.

29.    The minimum investment in the Funds was Five Hundred Thousand ($500,000.00) Dollars.

30.    CAI served as "Investment Manager" for the Funds and was responsible for investment management and administrative matters including, but not limited to, the selection of a limited number of specific segments of the fixed income markets with the goal of achieving risk-adjusted returns while providing

JSH/D266269v/F055307

liquidity and cash. AMACAR delegated its responsibilities for managing the funds to CAI.

31.    CAI's management fee was based upon a percentage of assets plus an incentive fee calculated as a percentage of the cumulative return of a series based on the excess of the cumulative return of a series over a cumulative benchmark return. This fee structure provided incentive for CAI to select riskier and/or more speculative investments for the Funds than it would otherwise have selected.

### Marketing of the Funds

32.    Beginning in or about 2004, the Marketing Defendants and the Individual Defendants marketed the Falcon Two investment products to potential investors as a relatively low-risk investment that offered low volatility and tax protected distributions. The volatility was consistently advertised as being consistent with intermediate government bonds and that complex hedge strategies would be utilized to minimize or eliminate any risk of loss of principal.

33.    In published documents dated in or about April 2005 and April 2007, Citigroup, CAI and CGM stated that Falcon Two offered a "multi strategy fixed income fund that seeks to provide absolute returns, ongoing cash flow and portfolio diversification."

34.    Over the course of several years, Defendants continued to make those and other representations for all Falcon investment products, including FPS.

35.    For example, Defendants advised Lead Plaintiff that:

A.    The Investment Manager would employ overall risk management and

JSH/D266269v/F055307

investment guidelines that were designed to control and/or reduce the strategy-specific risks while increasing the probability of meeting the Funds' investment objectives. The Funds sought to achieve attractive, risk-adjusted returns through the allocation of assets among a group of directional and non-directional primarily fixed income strategies that have demonstrated attractive historical returns with low correlations to each other and, in the aggregate, low correlations to traditional equity and fixed income investment strategies.

B.    Defendants' employment of an efficient portfolio allocation among these strategies within certain investment guidelines would produce a reasonable probability of achieving targeted absolute returns with low volatility over an investment horizon of five years.

31.    Defendants planned to structure the Funds' investments within the following objectives and guidelines:

- A target return of 7% to 10% absolute return per annum over a five-year investment horizon;

- Returns in excess of Lehman U.S Aggregate Fixed Income Index over a five-year investment horizon; and,

- A target volatility of 5% over a five-year investment horizon.

32.    Although certain of the risks were identified in the offering documents, in discussions with the Individual Defendants both before investing in the Funds and when it became clear to Lead Plaintiff that the Funds were in a financial crisis, Lead Plaintiff was advised that the volatility potential was no greater than ten (10%) percent to fifteen (15%) percent of their investments.

9

33.    The Marketing Defendants and the Individual Defendants frequently reiterated the foregoing statements regarding the low volatility, low risk and fixed-income nature of the investments, and at all times Lead Plaintiff understood that to mean that he could lose no more than ten (10%) percent to fifteen (15%) percent of the investment.

34.    Due to Defendants' positive, but misleading and/or untrue statements, Lead Plaintiff invested a total of Five Hundred Thousand ($500,000) Dollars into FPS and has not withdrawn from that investment.

**The Funds' Investments**

35.    As of December 27, 2006, based upon information provided by CAI, Standard & Poor's Ratings Services ("S&P") assigned its AA-f credit quality and S2 volatility ratings to Falcon Two.

36.    S&P's volatility ratings scale ranged from S2 to S6.  Those funds that are assigned an S2 volatility rating possess an aggregate level of risk that is less than or equal to that of a portfolio comprised of government securities maturing within three to seven years.   Funds with high sensitivity to changing market conditions are more risky and are assigned an S5 rating by S&P.

37.    In Financial Statements for Falcon Two for the years ended December 31, 2006 and December 31, 2007, Defendants reported to investors the AA-f credit quality and S2 volatility ratings.  In the December 31, 2007 Financial Statements, Defendants reported that the volatility ratings had drastically changed in January 2008.

JSH/D268269v/F055307

38.   According to the Investment Manager's Report to Shareholders contained in the Financial Statements for Falcon Two, "[t]he AA-f rating indicates that the Fund's portfolio holdings provide strong protection against losses from credit defaults . . . [and] [t]he S2 volatility rating indicates that the Fund maintains an aggregate level of risk that is less than or equal to that of a portfolio comprised of government securities maturing within three to seven years . . . ." CAI also advised that Falcon Two had "re-balanced our portfolio in the latter part of 2006 by moving into less volatile and more liquid strategies in an attempt to [provide] more flexibility to exploit potential opportunities in 2007." CAI further advised that, for 2007, it anticipated a "challenging environment for certain mortgage-related securities" including an elevated/increased market volatility "given the extent of uncertainty around the economy. . . ."

39.   Despite the anticipated volatility in the mortgage-related securities market, CAI assured investors in its Report that Falcon Two was "well-positioned to withstand any widespread downturn and potentially benefit from an increase in the volatility . . . ."

40.   Notwithstanding the foregoing representations, the Management Defendants had invested Falcon Two cash in mortgage-backed securities known as collateralized debt obligations ("CDO"). CDOs are created by bankers and money managers, who bundle bonds or loans to form a given CDO, and then typically "split" or "slice" the CDO into several parts. The CDO parts are then sold individually to investors as separate securities. The credit risk of the CDO is divided among different tranches; senior tranches (often rated AAA), mezzanine tranches (often

JSH/D266269v/F055307

rated AA to BB), and equity tranches (typically unrated), which are the most junior. Losses are applied in reverse order of seniority. Accordingly, junior tranches offer higher coupons to compensate for the added risk. The senior tranche is protected by the subordinated security structure and would thus be the highest rated class, delivering the lowest return. The equity tranche (also known as the first-loss tranche) is most vulnerable because it is the first class to absorb losses, and thus, must offer higher coupons to compensate for the higher risk.

41. In this case, the Management Defendants and the Individual Defendants invested the Funds' money in CDO's that were backed by sub-prime mortgages, which are riskier than traditional, credit-worthy mortgages because the borrowers have poor credit or heavy debt loads. The market value of these investments depended upon the flow of principal and interest paid by sub-prime borrowers whose mortgages served as the underlying collateral for the mortgage securities.

42. In many cases, Citigroup itself, and its subdivisions were directly involved in the creation of the CDO's that were purchased by the Funds, thereby engaging in self-dealing for their own benefit to the detriment of the investors. Thus, Defendants were keenly aware of the operations of the underlying financial instruments in which the Funds invested.

43. Despite this knowledge, the Management Defendants and the Individual Defendants continued to cause the Funds to invest in high-risk instruments, even as the sub-prime market was collapsing through increasing defaults and delinquencies, as described below.

12

JSH/D266269v/F055307

44.    In addition, Defendants invested Falcon Two money into other investment vehicles that were solely created, marketed, and managed by Defendants that were equally doomed including, but not limited to, the Municipal Opportunity ("MAT") funds and Condor Strategies funds.

45.    Defendants' incentive to place the Funds' money into riskier and/or more speculative investments was the result of CAI's management fee, which was based upon a percentage of assets plus an incentive fee calculated as a percentage of the cumulative return of a series based on the excess of the cumulative return of a series over a cumulative benchmark return.

46.    In the Notes to Financial Statements prepared by the Funds' independent auditor, KPMG Cayman Islands B.W.I. ("KPMG"), KPMG reported that as of December 31, 2006, CAI was paid Two Million Three Hundred Fifty-Three Thousand Four Hundred Thirty-Three and 00/100 ($2,353,433) Dollars in management fees for Falcon Two and was entitled to receive Four Million Eighteen Thousand Four Hundred Seventy and 00/100 ($4,018,470) Dollars under the incentive allocation for Falcon Two.

47.    In the Notes to Financial Statements prepared by KPMG, KPMG reported that as of December 31, 2007, CAI was paid One Million Seven Hundred Forty-Four Thousand Seven Hundred Four and 00/100 ($1,744,704) Dollars in management fees for Falcon Two and was entitled to receive Two Hundred Thousand Six Hundred Forty-Four and 00/100 ($200,644) Dollars under the incentive allocation for Falcon Two.

JSH/D268269v/F055307

### The Decline of the Sub-Prime Mortgage Market

48.     During the nation's recent housing boom, which occurred from late-2001 until mid-2006, CDOs backed by sub-prime loans became common investments and generated high rates of return.  During this period, there was a rapid growth in both loans to sub-prime borrowers and in non-traditional types of mortgages.  Indeed, by 2006, sub-prime mortgages comprised about 20% of all new mortgages, up from 2.5% in 1998.  As of December 31, 2006, Citigroup and its subsidiaries were among the largest managers of CDO's that included sub-prime mortgages.

49.     Even with the surge of risky loans, during the housing boom, the level of defaults remained low because borrowers who fell behind could avoid default by selling or refinancing into loans with better terms.  Consequently, the value of the CDOs backed by sub-prime loans remained stable, sustained by the steady stream of interest and principal payments.

50.     However, beginning at least as early as August 1, 2006, as home prices leveled off and declined in parts of the country, more borrowers fell behind on their mortgage payments.  Among sub-prime loans, delinquencies of more than 90 days, foreclosures and seized properties have risen to their highest levels in seven years.  Those events have lead to a decrease in the value of CDOs backed by such loans.

51.     Despite the deteriorating market conditions, the Management Defendants and the Individual Defendants continued to invest the Funds' money in

JSH/D266269v/F055307

risky sub-prime mortgage-backed securities, while at the same time failing to implement hedging and other strategies to minimize risk effectively.

52.    Notwithstanding their obligation to adequately assess, monitor and hedge the credit risks of investments held by the Funds, and their purported ability to create such hedges, the Management Defendants and the Individual Defendants failed to do so, in breach of their fiduciary duties.

53.    Additionally, the Marketing Defendants, the Management Defendants, and the Individual Defendants systematically and continuously failed to disclose to investors that the Management Defendants and the Individual Defendants were not (a) sufficiently monitoring and adequately assessing the credit risk inherent in the Funds' investments; (b) determining the frequency and severity of defaults of the underlying assets of each of the structured finance securities invested in by the Funds; (c) developing and implementing credit enhancement mechanisms that would cause cash flow to be diverted away from the Funds' riskier investments under certain market conditions; and (d) otherwise adequately engaging in hedging techniques to minimize risk.    Based upon these non-disclosures, the Marketing Defendants, the Management Defendants, and the Individual Defendants breached their fiduciary duties to Lead Plaintiff and other investors in the Funds.

54.    Moreover, due to Defendants' positive, but misleading and/or untrue statements regarding the low volatility of the Funds and the minimal risk of loss, Lead Plaintiff invested and/or remained invested in FPS.

JSH/D266269v/F055307

## THE COLLAPSE OF THE FUNDS

55.    The investment strategies utilized by the Management Defendants in the Funds were misrepresented to Lead Plaintiff and all other investors similarly situated.

56.    Rather than investing in vehicles consistent with intermediate government bonds and/or take other steps to minimize or eliminate any risk of loss of principal as represented to investors, the Management Defendants engaged in extremely high-risk investment strategies for their own benefit that placed Lead Plaintiff's investments, and that of other investors, at significant risk.

57.    Defendants' representations to investors were made at all times with knowledge that the Funds were going to implement high-risk strategies, which, in fact caused the plaintiff class to incur substantial losses of their investments.

58.    Despite earlier representations to Lead Plaintiff and others regarding the low volatility and minimal risk of loss in the Funds, as of September 30, 2007, the Funds had experienced significant volatility and the Funds have significantly underperformed as a result.

59.    Notwithstanding the foregoing, in or about September 2007, the Management Defendants and the Individual Defendants advised investors that the Funds remained well positioned to take advantage of market dislocations caused by volatility thereby further inducing Lead Plaintiff and others to invest and/or remain invested in FPS.

60.    In addition, in or about September 2007 the Individual Defendants advised Lead Plaintiff that the volatility would result in only a ten (10%) percent to

JSH/D266269v/F055307

fifteen (15%) percent loss of the investment, even if the market did not immediately stabilize.

61.    At no time did Defendants advise Lead Plaintiff of the precipitous decline in the investment in "real time" to enable him to minimize losses through redemption of interests in the Funds prior to the eventual suspension of withdrawals.

62.    On January 8, 2008, S&P changed its previously assigned AA-f credit quality and S2 volatility ratings afforded the Falcon Two assets to an AA-f credit quality and S5 volatility rating.  This reflected the inability of CAI to properly hedge the Funds' risks or control the losses.

63.    In an effort to revive the failing Funds, Citigroup entered into a $500 million credit facility with the all of the Falcon investment products, which facility was and is senior to the claims of the investors in the Funds, and which has the net effect of diluting the value of any investment in the Funds.  As a result of the infusion of capital, Citigroup placed the all of the Falcon investment products on its balance sheet.

64.    On or about January 31, 2008, one or more Defendants advised Lead Plaintiff that almost no losses in the Funds had been realized to date, but that client withdrawals from the Funds would force permanent losses.  As a result, CAI indefinitely suspended any and all redemptions of Funds' principal as well as any semi-annual distributions in the Funds.  The suspensions remain in effect.

65.    As of May 2008, Lead Plaintiff and all other investors in FPS Funds have lost approximately 90% of their investments.  As a result of the substantial

JSH/D266269w/F055307

losses, Citigroup offered to compensate investors of FPS and all of the other Falcon investment products for a small portion of their interests in exchange for a general release of all claims against all Defendants and an assignment of their interests (the "Tender Offer").

66.     As the May 2008 Tender Offer disclosures demonstrate, the Marketing Defendants, the Management Defendants, and the Individual Defendants have breached their fiduciary duties to Lead Plaintiff and the Class by failing to disclose that they have not monitored and/or hedged the Funds' positions as they had committed themselves to do, and that they otherwise failed to implement risk management procedures and other strategies to protect investors' interests.  As a result of those breaches, Lead Plaintiff and the Class have sustained enormous financial losses.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

67.     Lead Plaintiff brings this action as a class action pursuant to CPLR § 901 on behalf of himself and the members of a class (the "Class") of plaintiffs, consisting of all persons and entities who purchased interests in Falcon Plus Strategies LLC from September 2007 to January 8, 2008, and were damaged thereby.

68.     Excluded from the Class are all Defendants, their officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns, and any other entity in which Defendants have a controlling interest or of which they are a parent or subsidiary.

JSH/D266269v/F055307

69.    The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable.

70.    Although the exact number of the Class members is unknown at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members of the Class who acquired interests in FPS from Defendants during the Class period.  As of December 31, 2007, there were approximately 29,005,000 shares outstanding in FPS.  Record owners and other members of the Class may be identified from the records maintained by Defendants or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in other class actions.

71.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as Lead Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct.

72.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent in class and commercial litigation.

73.    Lead Plaintiff has no interest that is antagonistic to or in conflict with those of the Class.

74.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. There will be no difficulty in the management of this action as a class action.

JSH/D266269v/F055307

75.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether Defendants' acts, statements, and/or omissions, were tortious and led to damages to Class members ;

b.    whether Defendants participated in and pursued the common course of conduct complained of herein;

c.    whether documents, press releases, and other statements made or disseminated to investors misrepresented material facts about the management, investment, and risk aversion tactics to be utilized by the Funds;

d.    whether the Offering materials, Financial Statements, and other public statements made by Defendants misrepresented and/or failed to disclose material facts;

e.    whether Defendants willfully or negligently departed from their principal strategy to the detriment of the Class;

f.    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

76.    If Lead Plaintiff and all others similarly situated were required to prosecute their individual cases, it would increase both the expenses and cause delay not only to the class members, but also to Defendants and the Court.

77.    Conversely, a class action of this matter will avoid case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results, and equal protection

JSH/D266269v/F055307

of the rights of each class member, all by way of the comprehensive and efficient supervision of the litigation by a single court.

78.    Without class certification of a plaintiff class, the prosecution of separate actions by individual class members class would create a risk of:

a.    Inconsistent or varying adjudications with respect to individual members of the plaintiff class that would establish incompatible standards of conduct for Defendants; or

b.    Adjudications with respect to the individual members of the plaintiff class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication, or would substantially impair or impede their ability to protect their interests.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Class Claim—Negligent Misrepresentation)

79.    Lead Plaintiff repeats and realleges the allegations of paragraph 1 through 78 as if fully set forth herein.

80.    Defendants owed Lead Plaintiff and other members of the Class a duty of reasonable care in providing information to them about FPS.

81.    In order to induce Lead Plaintiff and other members of the Class to purchase interests in FPS, the Marketing Defendants, the Management Defendants, and the Individual Defendants made the misrepresentations and material omissions described above.

82.    The representations were false in material respects and Defendants knew they were false or, in the exercise of reasonable care, should have known they were false.

21

83.    Defendants knew or should have known that Lead Plaintiff and other members of the Class would rely upon the misrepresentations in the documents provided to them, as well as in the oral misstatements made to them.

84.    Moreover, Defendants knew or should have known that Lead Plaintiff and other members of the Class would rely upon the misrepresentations and/or omissions in assessing whether to purchase and/or remain invested in FPS.

85.    Lead Plaintiff and other members of the Class reasonably relied upon Defendants' grossly negligent misrepresentations and/or omissions and had no cause to believe that the statements made contained materially false and misleading information and/or omissions of material fact.

86.    In reliance upon the Defendants' grossly negligent misrepresentations, Lead Plaintiff purchased interests in FPS and remained invested although he could otherwise have redeemed the investment.

87.    As a direct and proximate result of Defendants' grossly negligent misrepresentations and/or omissions, Lead Plaintiff and other Class members have been damaged in an amount to be proven at trial.

88.    By virtue of the foregoing, as direct participants in the wrongs complained of above, the Marketing Defendants, the Management Defendants, and the Individual Defendants are liable, jointly and severally, to Lead Plaintiff and other members of the Class for negligent misrepresentation under New York law, with damages to be determined at trial.

JSH/D266269v/F055307

## AS AND FOR A SECOND CAUSE OF ACTION
### (Class Claim--Fraud)

89.    Lead Plaintiff repeats and realleges the allegations of paragraph 1 through 78 as if fully set forth herein.

90.    The Marketing Defendants, the Management Defendants, and the Individual Defendants knowingly disseminated materially false information to members of the Class concerning, among other things, the risks associated with the Funds and the performance of the Funds.

91.    The Marketing Defendants', the Management Defendants', and the Individual Defendants' misrepresentations had the intended effect of creating the false impression among purchasers of interests in the Funds that there was little or no risk associated with the investment and/or that the risks were being adequately hedged.

92.    As a direct and proximate result of the Marketing Defendants', the Management Defendants', and the Individual Defendants' fraudulent conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchase of interests in FPS and/or remaining invested in the Funds during the Class Period.

93.    By virtue of the foregoing, as direct participants in the wrongs complained of above, the Marketing Defendants, the Management Defendants, and the Individual Defendants are liable, jointly and severally, to Lead Plaintiff and other members of the Class for fraud under New York law, with damages to be determined at trial.

JSH/D266269v/F055307

## AS FOR AND FOR A THIRD CAUSE OF ACTION
### (Class Claim--Breach of Fiduciary Duty)

94.    Lead Plaintiff repeats and realleges the allegations of paragraph 1 through 78 hereof as if fully set forth herein.

95.    CAI, as Investment Manager for the Funds, was and is responsible for investment management and administrative decisions.    AMACAR was the sole general partner of the Funds.

96.    Management Defendants and the Individual Defendants owed Lead Plaintiff and all Class members the highest degree of due care, good faith, candor, loyalty and fair dealing.    Nevertheless, AMACAR abdicated its responsibilities and delegated substantially all of the day to day operations of the Funds to CAI.    CAI failed to perform its duties in accordance with its fiduciary responsibilities.

97.    Over the course of several years, the Marketing Defendants, the Management Defendants, and the Individual Defendants systematically failed to disclose the volatile nature of the investments, failed to conduct proper sensitivity analyses regarding the risks inherent in the nature of the investments and/or failed to properly disclose the results of those analyses to Lead Plaintiff and others, were not otherwise adequately engaged in hedging techniques as advertised in an effort to minimize risk, and misrepresented the overall investment risks and actual losses incurred.

98.    Had the Marketing Defendants, the Management Defendants, and the Individual Defendants disclosed the true facts to Lead Plaintiff and others, they would have taken steps to avoid the massive losses they suffered including, but not limited to, withdrawing their investments.

24

99.   Based upon the foregoing acts and/or omissions, the Marketing Defendants, the Management Defendants, and the Individual Defendants have breached their fiduciary duties to Lead Plaintiff and other Class members.

100.   Lead Plaintiff and others have suffered damages proximately caused by the Marketing Defendants', the Management Defendants', and the Individual Defendants' breach of their fiduciary duties and are liable for damages in an amount to be proven at trial.

101.   By virtue of the foregoing, as direct participants in the wrongs complained of above, the Marketing Defendants, the Management Defendants, and the Individual Defendants are liable, jointly and severally, to Lead Plaintiff and other members of the Class for breach of fiduciary duty under Delaware law, with damages to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
**(Derivatively on Behalf of FPS**
**For Breach of Fiduciary Duty)**

102.   Lead Plaintiff repeats and realleges the allegations of 1 through 101 hereof as if fully set forth herein

103.   Under Delaware law, the Marketing Defendants, the Management Defendants, and the Individual Defendants owed FPS the highest obligations of due care, good faith, candor, loyalty and fair dealing.

104.   By reason of the conduct described above, the Management Defendants and the Individual Defendants breached their fiduciary duties to FPS, including by their grossly negligent and/or bad faith failure to adequately assess,

JSH/D266269v/F055307

monitor and hedge the credit risks of investments held by the Funds and otherwise failing to manage the Funds with the requisite amount of due care.

105. By reason of the conduct described above, the Marketing Defendants and the Individual Defendants breached their fiduciary duties to FPS by failing to disclose the risks of the investments and the inability of the Management Defendants and/or the Individual Defendants to hedge those risks while the Funds' portfolio values were declining.

106. FPS has suffered damages proximately caused by Defendants' breaches of their fiduciary duties, and Defendants are liable for damages in an amount to be proven at trial.

107. Plaintiff will adequately and fairly represent the interests of FPS in enforcing and prosecuting its rights.

108. Lead Plaintiff did not make any demand on the Funds to institute this action because such demand would have been a futile and useless act, given that the Citigroup entities sued herein control the Funds and are the primary wrong doers.

WHEREFORE, Lead Plaintiff demands judgment as follows:

a. Declaring that this lawsuit is properly maintainable as a class action and certifying Lead Plaintiff as representative of the Class;

b. Awarding compensatory damages against Defendants upon behalf of the Class and FPS as described above, jointly and severally, in an amount not yet fully ascertained, which when determined with sufficient specificity will be alleged and proven at trial;

JSH/D266269v/F055307

c.  Awarding pre-judgment interest at the maximum rate allowable by law;

d.  Awarding Lead Plaintiff attorneys fees, costs and disbursements and;

e.  Granting such other and further relief as the Court may deem just and
    proper.

Dated: Jericho, New York
       June 5, 2008

SILVERMAN ACAMPORA LLP
Co-Counsel for Lead Plaintiff

By:    Ronald J. Friedman, Esq.
       Jay S. Hellman, Esq.
       Members of the Firm
100 Jericho Quadrangle, Suite 300
Jericho, New York  11753
(516) 479-6300

Dated: New York, New York
       June 5,  2008

BRAGAR EAGEL WEXLER & SQUIRE, P.C.
Co-Counsel for Lead Plaintiff

By:    Lawrence P. Eagel, Esq. (LPE#4505)
885 Third Avenue, Suite 3040
New York, New York 10022
(212) 308-5858

27

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------X

GARY J. ZENTNER, as Trustee of the GARY J. ZENTNER
and ROBIN C. ZENTNER TRUST, on behalf of himself
and all others similarly situated, and Derivatively on behalf
of FALCON PLUS STRATEGIES LLC,

                                      Plaintiffs,               Index No.

-against-

CITIGROUP, INC., CITIGROUP ALTERNATIVE
INVESTMENTS, LLC, CITIGROUP GLOBAL
MARKETS, INC., FALCON PLUS STRATEGIES
LLC, FALCON PLUS LLC, FALCON STRATEGIES TWO,
LLC, AMACAR GP, INC., DONALD LUCARDI,
and REAZ ISLAM,

                                       Defendants.

------------------------------------------------------------------------X

**Summons and Complaint**

BRAGAR WEXLER EAGEL & SQUIRE, P.C.
Co-Counsel for Lead Plaintiff
Office and Post Office Address
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone (212) 308-5858

# Exhibit B

FILED by **RB** D.C.
ELECTRONIC

APR. 4, 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

Case No.: **08-80346-Civ-ZLOCH/SNOW**

|  |  |
|---|---|
| A. ROBERT ZEFF TTEE FBO | ) |
| A. ROBERT ZEFF REVOCABLE LIVING | ) |
| TRUST U/A/D 10-15-97 on behalf of the Trust | ) |
| and all others similarly situated, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) |
| CITIGROUP ALTERNATIVE INVESTMENTS | ) |
| LLC, CITIGROUP, INC., and FALCON | ) |
| STRATEGIES TWO B LLC, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## COMPLAINT

COMES NOW PLAINTIFFS, A. ROBERT ZEFF TTEE FBO A. ROBERT

ZEFF REVOCABLE LIVING TRUST U/A/D 10-15-97 on behalf of the Trust and all

others similarly situated, by and through their undersigned counsel, file this Complaint

seeking judgment against Defendants CITIGROUP ALTERNATIVE INVESTMENTS

LLC, CITIGROUP, INC. and FALCON STRATEGIES TWO B LLC, and in support

thereof state as follows:

## GENERAL ALLEGATIONS

Plaintiff makes the following allegations based upon the investigation undertaken by

Plaintiff's counsel, which include without limitation:

A.    A review of all the subscription materials provided to the Plaintiff A. ROBERT ZEFF, prior to his purchase of the Falcon Strategies Two B LLC Hedge Fund in April, 2007.

B.    A review of prospective information pertaining to the Falcon Strategies TWO B LLC Fund and,

C.    An analysis of available news articles and reports, price history data, public filings, press releases and other matters of public records, and believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF ACTION

This is a class action on behalf of all purchasers of the Falcon Strategies Two B LLC Hedge Fund who purchased the fund from September 30, 2005 through January 8, 2008.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.A. §1331, §1332 and §1337.

2.    At all times relevant hereto, Plaintiff A. ROBERT ZEFF has been a resident of the State of Florida and the trustee of the A. Robert Zeff revocable Living Trust dated 10/15/97.

3.    Defendant CITIGROUP ALTERNATIVE INVESTMENTS, LLC, is a subsidiary of Citigroup, Inc. and provides alternative investment products to qualified clients and institutional investors. CITIGROUP ALTERNATIVE INVESTMENTS, LLC is responsible for manufacturing, sourcing, structuring, marketing, and managing alternative investments for Citigroup on a global basis.

4.    Defendant CITIGROUP, INC. is a major American financial services company based in New York, New York.

2

5.    Defendant, FALCON STRATEGIES TWO B LLC is a Delaware limited liability company organized to issue shares of limited liability company interest. The company is a vehicle for investors to gain exposure to specific segments of the fixed income markets that the investment manager believes to offer enhanced value opportunities. The investment manager selects a limited number of specific segments of the fixed income market and employs the companies assets in trading and investment strategies within these markets with the goal of achieving risk-adjusted returns while providing liquidity and cash.

6.    Defendant, FALCON STRATEGIES TWO B LLC, contracted with Citigroup Alternative Investments LLC to provide investment management services for its Fund. Citigroup Alternative Investment LLC has provided such investment management services since September, 2005.

7.    Plaintiff, A. ROBERT ZEFF, TTEE FBO A. ROBERT ZEFF REVOCABLE LIVING TRUST U/A/D 10-15-97 purchased shares of Falcon Strategies Two B LLC from Citigroup Alternative Investments LLC in April, 2007. His total investment was $500,000.00. Hereinafter referred to as Robert Zeff.

8.    The above named Defendants are, at times, referred to collectively as the "Defendants."

## FACTS

9.    Robert Zeff, a resident of Boca Raton, Florida, became a client of a Citigroup on January 25, 2006. Mr. Zeff's broker at Citigroup was Neal Fox. Mr. Fox was an employee of Citigroup Global Markets, Inc. and was based in their office located at 595 South Federal Highway, Boca Raton, Florida 33432. In 2005, the Defendants began collectively marketing the Falcon Strategies Two B Fund. The Fund was uniformly marketed to all potential investors as

3

an extremely low risk investment that offered low volatility and tax protected distributions. The volatility was adverted uniformly as being consistent with intermediate government bonds and that complex hedge strategies would be utilized to minimize or eliminate any risk of loss of principal. Specifically, the Defendants asserted in writing:

A.    The Fund provides a "multi strategy fixed income alternative that seeks to provide investors with absolute returns, current income, and portfolio diversification. (emphasis added)."

B.    The Fund would exploit opportunities across primarily high grade income markets using various relative value, arbitrage and spread strategies that leveraged Citigroup's expertise in structuring, investments and risk management.

C.    The Fund would offer the utilization of a pure alpha strategy that seeked to provide attractive risk adjustment returns in excess of fixed income indices.

D.    The Investment Manager would employ overall risk management and investment guidelines that were designed to control and/or reduce the strategy-specific risks while increasing the probability of meeting the Company's investment objective.

E.    The Investment Manager would employ an ongoing risk management process that seeks to achieve: (i) diversification across trading styles, asset classes and markets; and (ii) discretionary application, where possible, including: (i) a frequent review of trade reports and risk profiles for each Advisor; and (ii) ongoing quantitative and qualitative monitoring of Advisors.

F.    The Company would seek to achieve attractive, risk-adjusted returns through the allocation of assets among a group of directional and non-directional primarily fixed income strategies that have demonstrated attractive historical returns with

4

low correlations to each other and, in the aggregate, low correlations to traditional equity and fixed income investment strategies.

G.    "The Company's assets are currently allocated to the following six strategies within the credit, mortgage-backed (residential and commercial) asset-backed and municipal markets: relative value bank loans, relative value preferred securities, relative value fixed income (mortgage-backed securities and asset-backed securities), municipal arbitrage, mortgage-backed arbitrage (long/short) and opportunistic mortgage-backed securities."

H.    The Defendants represented that each of these strategies demonstrated long-term investment return advantages and that, given the broad universe of securities, the Investment Manager could in a methodical manner exploit such opportunities.

I.    Based on the Defendants' analysis of historical return and correlation data, the Defendants represented that an efficient portfolio allocation among these strategies within certain investment guidelines would produce a reasonable probability of achieving targeted absolute returns with low volatility over an investment horizon of five years.

J.    The Defendants planned to structure the Company's investments within the following objectives and guidelines:

- A target return of 7% to 10% absolute return per annum over a five-year investment horizon;

- Returns in excess of Lehman U.S Aggregate Fixed Income Index over a five-year investment horizon; and,

- A target volatility of 5% over a five-year investment horizon.

Due to the Defendants' positive, but misleading or untrue statements, millions of dollars

5

poured into the Defendants' Fund. However, the investment strategies utilized by the

Defendants were clearly misrepresented to Mr. Zeff and all other investors similarly situated, as

extremely high risk investment strategies were undertaken by the Defendants, which placed Mr.

Zeff's investment and other investors similarly situated, at significant risk. The representations

made by the Defendants to investors were made at all times with knowledge that the fund was

going to implement high risk strategies. Due to the high risk hedging strategies implemented by

the Defendants, Mr. Zeff and other investors similarly situated have experienced substantial loss

of principle. In fact, as of January, 2008, Mr. Zeff and all other investors have lost

approximately 40% of their investment. In addition, the Defendant, CITIGROUP

ALTERNATIVE INVESTMENTS, LLC suspended any and all redemptions of fund principle

and it appears very likely that Mr. Zeff and other investors similarly situated, will experience a

complete loss of their investment.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

10. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(b)(1) and, in the alternative, (b)(3) on behalf of himself and the members of a class

("Class") of plaintiffs, consisting of all persons and entities who purchased Falcon Strategies

Two B LLC from September 30, 2005 to January 8, 2008.

11. As alleged herein, defendants knowingly or recklessly disseminated materially

false and misleading information to the investing public regarding, *inter alia*, the risk associated

with the fund. Defendants' conduct had the intended effect of creating the false impression

among purchasers of the fund that there was little or no risk associated with the investment.

12. The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown to Plaintiffs at this time

6

and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least thousands of members of the Class. Record owners and other members of the Class may be identified from the records maintained by the Defendants or their transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

13.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Defendants' wrongful conduct in violation of federal and state law that is complained of herein.

14.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent in class and securities litigation.

15.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether federal and state laws were violated by Defendants' acts as alleged herein;

b.    whether Defendants participated in and pursued the common course of conduct complained of herein;

c.    whether documents, press releases and other statements disseminated to investors during the Class Period misrepresented material facts about the management, investment and risk aversion tactics to be utilized by the Fund;

d.    whether statements made by the Defendants to investors during the Class Period misrepresented material facts about the management, investment and risk aversion tactics to be utilized by the Fund;

7

e.    whether the Prospectuses, Analysts' Research Reports, and other public statements made by the Defendants misrepresented and/or failed to disclose material facts; and,

f.    whether the Defendants negligently departed from their principal strategy to the detriment of the class.

g.    whether the members of the Class have sustained damages and, if so, the proper measure of damages.

16.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. There will be no difficulty in the management of this class action.

17.    To process individual cases would increase both the expenses and cause delay not only to class members, but also to defendants and the Court.

18.    In contrast, a class action of this matter will avoid case management difficulties and provide multiple benefits to the litigating parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of each class member, all by way of the comprehensive and efficient supervision of the litigation by a single court.

19.    Without plaintiff class certification, the prosecution of separate actions by individual members of the plaintiff class would create a risk of:

    a.    Inconsistent or varying adjudications with respect to individual members of the plaintiff class that would establish incompatible standards of conduct for defendants; or

    b.    Adjudications with respect to the individual members of the plaintiff class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication, or would substantially impair or

8

impede their ability to protect their interest.

## BACKGROUND OF THE FRAUD COMMITED BY THE DEFENDANTS

20.    On September 30, 2005, Falcon Strategies Two B, LLC, (hereinafter referred to as "Falcon") a Delaware limited liability company commenced operations.  Shortly thereafter, Falcon entered into an investment management agreement with Citigroup Alternative Investments, LLC (hereinafter referred to as "CAI") to provide investment management services for the Falcon Fund.  CAI is a subsidiary of Citigroup, Inc. and is registered by the Securities and Exchange Commission as an investment advisor.  Following the execution of the management agreement with CAI, Citigroup through its employees, agents, and other personnel began actively marketing shares of Falcon Strategies Two B LLC to its clients.  This included marketing shares through Smith Barney, a subsidiary of Citigroup.  The Defendants actively marketed the Fund as a multi strategy fixed income alternative that promised to provide investors with absolute returns, current income and portfolio diversification.  The Fund's philosophy was advertised as utilizing complex arbitrage and hedge strategies that would severely limit risk and generate income for the investor.  All of the Defendants understood this was the stated goal and purpose of the Falcon Fund.  As a result, shares in Falcon Fund were actively marketed by the investment advisors of the Defendants in concert with one another to induce investors to purchase shares of the fund.  The Defendants induced investors by promising an absolute return and an alpha strategy that would provide attractive risk adjusted returns in excess of fixed income.  The subscription agreement, provided to each investor, outlined a program that included: (1) A target return of 7% to 10% absolute return per annum over a five year investment horizon and (2) a target volatility of 5% over a five year investment horizon.  However, at all

9

times, Defendants knew and were aware that investment decisions had been made and actions taken by the Fund manager, that created large volatility and risk for the investors. Defendants undertook leveraged fixed income strategies that were far from conservative and were extremely risky which resulted in substantial losses of principle for the investors. During CAI's management of the fund, at no time were the high risk investment strategies utilized by the fund manager disclosed to the investors, including the Plaintiff. In fact, Standard and Poor's had assigned the Fund an S2 volatility rating given its belief that Falcon maintained a low to moderate sensitivity to change in market conditions given its stated investment strategy. An S2 rating is defined by Standard and Poor's as equivalent to "a portfolio comprised of government securities maturing in 3 – 7 years." However, due to the investment/management decisions of the Defendants, Standard and Poor's changed their rating of the Fund to an S5 on January 8, 2008. A Standard and Poor's S5 rating indicate the Fund "may be exposed to a variety of significant risk, including high concentration risks, high leverage in investments in structured and/or liquid securities." This is a much different product than what was purchased by the Plaintiff, and others similarly situated who purchased their funds prior to January 8, 2008. At all times, the Defendants were aware and knew high risk investment and management strategies were being undertaken managing the Fund, but failed to disclose those investment strategies to the existing investors and continued to market the fund as a low risk investment tool to investors. These were material misrepresentations made to the investing public and the Defendants made these representations with scienter and knowledge that the representations were false. Defendant's motive for undertaking high risk investment strategies with the Fund was the generation of exorbitant fees which were tied to total fund assets. Specifically, all Plaintiffs were charged with a 2 ½% management fee regardless of performance. However, in addition to the 2

10

½%, the Fund also allowed for an incentive allocation which provided the Defendants, including CIA, an additional fee based on performance. Therefore, the more money the manager earned for the Fund, the higher their compensation. This created an incentive for CAI and the other Defendants to take greater risk with the Fund's assets to try and generate a greater return.

<u>COUNT 1</u>

<u>VIOLATIONS OF COMMON LAW FRAUD</u>
<u>(BY PLAINTIFF AND CLASS MEMBERS AGAINST ALL DEFENDANTS)</u>

21.    Plaintiff incorporates by reference and realleges the allegations as set forth above.

22.    This Count is based upon common law fraud.

23.    During this Class Period, the Defendants, singularly and in concert, engaged in a plan, scheme, and unlawful conspiracy and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud upon Plaintiff and other members of the Class, and made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made not misleading to Plaintiff and other Class members. The purposes and effect of said scheme was to generate management fees from the fund at the expense of increased risk for the investor.

24.    During the Class Period, the Defendants, pursuant to said plan, scheme, and unlawful conspiracy and course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of false and misleading statements to the investors which were contained in the various documents and releases specified herein, and failed to disclose material facts to the investors.

11

25.    The Defendants knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the investments made the Plaintiff and other members of the Class.

26.    The Defendants herein knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would lead to false assurance for the investors that their investments were subject to little or no risk.  The Defendants, by acting as hereinabove described, did so knowingly or in such reckless or grossly negligent manner as to constitute a deceit and fraud upon Plaintiff and other members of the Class.

27.    The Defendants are liable as direct participants in the wrongs complained of herein.  The Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Fund so that the decisions made by the Plaintiff and other Class members would be based on truthful and accurate information.  The Defendants participated in the wrongdoing complained of in order to generate large management fees.

28.    As a result of the dissemination of the aforementioned false and misleading reports and statements, the Plaintiff and others similarly situated invested in a high risk fund and have suffered substantial losses.  In ignorance of the purposeful scheme designed to create the illusion of absolute return and extremely low risk, which was concealed by the Defendants, Plaintiff and the other members of the class justifiably relied on the false and misleading reports and statements and purchased the Falcon Strategies Two B LLC during the Class period.

29.    Had Plaintiff and the other members of the Class known of the materially adverse information not disclosed by the Defendants, they would not have purchased the Fund.

30.    By virtue of the foregoing, the Defendants each committed fraud.

12

31.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchase of the Fund during the Class period.

## COUNT II

## FOR VIOLATIONS OF FLORIDA BLUE SKY LAW
## (BY PLAINTIFF AND CLASS MEMBERS AGAINST ALL DEFENDANTS)

32.    Plaintiff incorporates by reference and realleges the allegations as set forth above.

33.    This Count is based upon the Florida Blue Sky Law, F.S.A. Section 517.301.

34.    During the Class period, the Defendants, singularly and in concert, engaged in a plan, scheme, and unlawful conspiracy and course of conduct, pursuant to which they knowingly and/or recklessly engaged in acts, transactions practices and courses of business which operated as a fraud upon Plaintiff and other members of the Class, and made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made not misleading to Plaintiff and other Class members.  The purposes and effect of said scheme was to lure investors seeking investment strategies with little or no risk incentives to invest in their fund and develop large fund assets.  Defendant then sought to maximize their management fees in the Fund by engaging in high risk / high reward investment tactics exposing investors to loss of principle.

35.    The Defendants knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the decisions of the investors.

36.    The Defendants herein knew or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements, and omissions would adversely affect the decisions of

13

the investors to purchase the Fund. The Defendants, by acting as hereinabove described, did so knowingly or in such a reckless or grossly negligent manner to constitute a deceit and fraud upon Plaintiff and the other members of the Class.

37.    The Defendants are liable as direct participants in the wrongs complained of herein. The Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Fund. The Defendants participated in the wrongdoing complained of in order to lure investors and generate massive management fees for the Fund.

38.    As a result of the dissemination of the aforementioned false and misleading reports and statements, Plaintiff and other Class members purchased the Fund. In ignorance of the purposeful scheme designed to create the illusion of absolute return and little or no risk, which was concealed by the Defendants, Plaintiff and the other members of the Class purchased the Fund justifiably relying upon the false and misleading reports and statements.

39.    Had Plaintiff and other members of the Class known of the materially adverse information not disclosed by the Defendants, they would not have purchased the Fund.

40.    By virtue of the foregoing, the Defendants each violated Florida Blue Sky Law. F.S.A. Section 517.301.

41.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Fund during the Class period. In addition, section 517.211, Fla. Statute provides that if a seller is untruthful in a sale, a buyer can rescind the transaction and get his money back.

## COUNT III

### NEGLIGENT MISREPRSENTATION
### (BY PLAINTIFF AGAINST ALL DEFENDANTS)

14

42.    Plaintiff incorporates by reference and realleges the allegations as set forth above.

43.    With respect to the information provided to the Plaintiff and other members of the Class about the Fund, Defendants owed Plaintiff and other members of the Class a duty of reasonable care. Defendants knew that Plaintiff and the other members of the Class were relying upon the misrepresentations set forth in documentation provided as well as in the oral statements made to the Plaintiff and other members of the Class.

44.    In order to induce Plaintiff and other members of the Class to purchase the Fund, Defendants made the misrepresentations and material omissions specified herein.

45.    In fact, these representations were false in material respects, and Defendants knew they were false or would have known they were false had they exercised reasonable care.

46.    Moreover, Defendants knew that the Plaintiff and other members of the Class would rely on these false representations and omissions in assessing whether to purchase the Fund.

47.    Plaintiff and other members of the Class reasonably relied on Defendants' misrepresentations omissions, as they had no cause to believe that the statements made contained materially false and misleading information and omissions of material fact.

48.    As a direct and proximate cause of Defendants' negligent misrepresentations, Plaintiff and other members of the Class have been damaged. They would not have purchased the Fund but for false statements and omissions of Defendants.

## COUNT IV

## VIOLATIONS OF SECTION 12(A)(2) OF THE 1933 ACT AGAINST ALL THE DEFENDANTS

15

49.    This Count IV is asserted against the Defendants as participants in the distribution of the Funds' shares.

50.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein, except to the extent any allegations above contain facts which are unnecessary or irrelevant for purposes of stating a claim under Section 12, including allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the § 12 Defendants, other than strict liability or negligence.

51.    The § 12 Defendants offered and sold a security, namely shares of the Funds' common stock, by means of a prospectus or were controlling persons of the Funds or of those who offered and sold the Funds' shares. This prospectus contained untrue statements of material facts and omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, which statements and omissions the § 12 Defendants knew, or in exercise of reasonable care the § 12 Defendants would have known, were false or were material facts which were required to be disclosed to avoid the representations which were made from being misleading.

52.    The § 12 Defendants actively solicited the sale of the Funds' shares to serve their own financial interests.

53.    Plaintiff and the other members of the class did not know that the representations made to them in connection with the distribution to them by the § 12 Defendants regarding the matters described above were untrue and did not know the above described material facts that were not disclosed.

54.    As a result of the matters set forth herein, pursuant to § 12(a)(2) of the Securities Act, Plaintiff and Class members are entitled to recover the consideration paid for such security

16

with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if they no longer own such shares.

55.    Plaintiff and putative Class members who do not opt out, hereby tender their shares in the Funds.

56.    The § 12 Defendants are liable to Plaintiff and Class members pursuant to § 12(a)(2) of the Securities Act, as sellers of the Funds' shares.

<u>PRAYER FOR JUDGMENT AND RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment and relief as follows:

1.    Declaring that this lawsuit is properly maintainable as a class action and certifying Plaintiff as representative of the Class;

2.    Awarding compensatory damages against Defendants individually, jointly and severally in an amount not yet fully ascertained, which when determined with sufficient specificity will be alleged and proved at trial;

3.    Prejudgment interest at the maximum rate allowable by law;

4.    Enjoining Defendants' wrongful conduct;

5.    Awarding to Plaintiff and the Class Members disgorgement of Defendants' profits and commissions;

6.    Awarding Plaintiff his costs and disbursements and reasonable allowances for Plaintiff's counsels' and experts', fees and expenses;

7.    Awarding Plaintiff and Class members' restitution and rescission as permitted by law;

8.    Punitive damages in an amount to be determined at trial;

9.    Granting such other and further relief as the Court may deem just and proper.

17

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a trial by jury on all Counts and as to all issues.

Dated: April 3⟋2, 2008.

Respectfully submitted,

By: _____

Theodore Babbitt, Esquire
Florida Bar No.: 091146
E-mail: tedbabbitt@babbitt-johnson.com
Babbitt, Johnson, Osborne & LeClainche, P.A.
1450 Centrepark Boulevard, Suite 100
West Palm Beach, FL 33401
Telephone: (561) 684-2500
Facsimile: (561) 684-6308

**Attorneys for Plaintiff**

18

# Exhibit C

JUDGE CASTEL

'08 CIV 4723

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

FERGUSON FAMILY TRUST, On Behalf of   :   Civil Action No.
Itself and All Others Similarly Situated,
                                      :
                                          CLASS ACTION
                Plaintiff,            :
                                          COMPLAINT FOR VIOLATION OF THE
    vs.                               :   FEDERAL SECURITIES LAWS AND
                                          DELAWARE LAW
FALCON STRATEGIES TWO LLC,            :
AMACAR GP, INC., CITIGROUP            :
ALTERNATIVE INVESTMENTS LLC,          :
CITIGROUP, INC. and REAZ ISLAM,       :
                                      :
                Defendants.           :

—————————————————————— x   DEMAND FOR JURY TRIAL

RECEIVED
MAY 20 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## NATURE OF THE ACTION

1.    This is a class action on behalf of all persons or entities who have tendered or are being asked to tender their shares of Falcon Strategies Two LLC ("Falcon" or the "Company") in connection with a tender and exchange offer (the "Tender Offer"), on the basis of a Confidential Tender and Exchange Offer Memorandum, dated May 8, 2008 (the "Memorandum"), that contains materially misleading statements and omissions. This action charges defendants Falcon, AMACAR GP, Inc. ("AMACAR"), Citigroup, Inc. ("Citigroup"), Citigroup Alternative Investments LLC ("CAI") and Reaz Islam ("Islam") with violations of Sections 10(b) and 14(e) of the Exchange Act of 1934 (the "Exchange Act"), as well as Rule 10b-5 promulgated thereunder and Delaware law.

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], as well as Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Delaware law. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa], and it has supplemental jurisdiction over the Delaware law claims under 28 U.S.C. § 1367.

3.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District, including the dissemination of the materially false and misleading statements alleged herein. In addition, Citigroup and CAI have operations located in this District and Falcon lists its mailing address as c/o CAI, in New York, New York.

4.    In connection with the acts, conduct and other wrongs alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails and interstate telephone communications.

- 1 -

## PARTIES

5.    Plaintiff Ferguson Family Trust acquired and holds Falcon's 2005 Series 3-A shares and, like other investors, received the Memorandum from defendants pursuant to which Falcon has asked investors to tender their shares in connection with the Tender Offer.

6.    Defendant Falcon is a Delaware limited liability company that was purportedly formed on April 27, 2004 to serve as a multi-strategy fixed income alternative seeking to provide investors with absolute returns, current income and portfolio diversification. The Company, which commenced operations on October 29, 2004, claimed to invest in a select combination of fixed income strategies and to achieve attractive risk-adjusted returns. Falcon issued nine series of units of limited liability company interests (or "shares") that comprise Portfolio "A" of its investments, which are the subject of the Tender Offer.[1]   Falcon lists its mailing address as c/o CAI, 731 Lexington Avenue, 27th Floor, New York, New York.

7.    Defendant AMACAR is a Delaware corporation that serves as the sole managing member of the Company.  AMACAR purportedly assigned substantially all authority to manage the day-to-day operations and assets of Falcon to CAI.

8.    Defendant CAI is an integrated alternative investments platform that manages a wide range of products across five asset classes, including private equity, hedge funds, real estate, fixed income and infrastructure.  CAI manages capital on behalf of defendant Citigroup, as well as third-party institutional and high net worth investors, and has headquarters located at 731 Lexington Avenue, 27th Floor, New York, New York.  CAI acts as the investment manager for Falcon, and manages the day-to-day operations and assets of Falcon.   In connection with its operation of the

---

[1]    It appears that the Company has not issued any shares for Portfolio "B."

- 2 -

Company, CAI receives a management fee which is calculated as a percentage of net assets, calculated and paid monthly in arrears, a portion of which is used to pay investment managers and sub-advisors to any Portfolio funds (presumably including Islam). CAI also receives an incentive allocation which is calculated as a percentage of the cumulative return of a series of shares calculated and paid quarterly in arrears. CAI has received millions of dollars in management and incentive fees during its tenure, and had an incentive to leverage the fund's operations in order to generate fees.

9.      Defendant Islam served as the Managing Director and Senior Investment Officer of CAI and the Managing Director of Citigroup Fixed Income Alternatives, which purportedly specializes in the identification, development and management of alternative fixed-income products. At all relevant times, Islam managed Falcon on behalf of CAI.

10.      Defendant Citigroup describes itself as a global diversified financial services holding company whose businesses provide a broad range of financial services to consumer and corporate customers. Citigroup has more than 200 million customer accounts and does business in more than 100 countries. Citigroup is the parent company of CAI. Concurrently with each share tendered by investors in connection with the Tender Offer, Falcon will sell one share of a new class of limited liability company interest to Citigroup and/or its affiliated entities for a purchase price equal to the amount of consideration offered to members in the Tender Offer. The proceeds from the sale of these shares to Citigroup will be used to pay the offered consideration to the members who tender their shares.

## SUBSTANTIVE ALLEGATIONS

### Background

11.      In October 2004, Falcon was formed by Citigroup to serve as a multi-strategy fixed income alternative seeking to provide investors with absolute returns, current income and portfolio

- 3 -

diversification. In order to achieve these benefits, Falcon purported to invest in certain fixed-income investments that Citigroup claimed would provide higher yields. Plaintiff and other investors acquired shares in Falcon as a result of this seemingly conservative investment approach, which Citigroup and its agents represented as a safe investment for them based on their conservative risk tolerances.

12.    In actuality, unbeknownst to investors, Falcon's investment approach was not conservative but was instead highly leveraged on the condition of the credit markets and liquidity in the bond markets. In this regard, Falcon's investments were more akin to derivatives. In fact, Falcon employed municipal bond arbitrage,[2] carried commercial debt obligations and held asset-backed mortgage instruments that were intrinsically tied to the condition of the credit and bond markets. Moreover, Falcon heavily invested in funds under the Citigroup umbrella that employed these investment strategies. When these markets failed, the underlying investments declined in value.

13.    These issues adversely impacted the value of Falcon's, so much so that in February 2008, Falcon and its affiliated funds entered into a $500 million credit facility with Citigroup to obtain additional borrowing capacity and liquidity to help meet variation margin calls and prevent a forced sale of fund assets by financing counterparties. As of March 31, 2008, the funds had drawn an aggregate of approximately $335 million under the credit facility. Although the repayment of the

---

[2]    Municipal bond arbitrage generally consists of building a leveraged portfolio of tax-exempt municipal bonds while simultaneously hedging the duration risk in that portfolio by shorting taxable corporate bonds. It is a relative value strategy that attempts to capitalize on the fact that interest on municipal bonds is exempt from federal income tax. The arbitrage manifests itself in the form of a relatively cheap longer-maturity municipal bond, which is a municipal bond that yields significantly more than 65% of a corresponding taxable corporate bond. The steeper slope of the municipal yield curve allows participants to collect more after-tax income from the municipal bond portfolio than is spent on the interest rate swap.

- 4 -

credit facility is subordinate in right to the claims of other financing counterparties, it is senior to the interests of Plaintiff and the other investors in Falcon and the other funds.

14.    Despite the cash infusion provided by the credit facility, the value of Falcon's shares continued to decline. On March 20, 2008, CAI announced that because of the Company's low cash position and ongoing dislocation in the credit markets, it had indefinitely suspended redemptions from the Falcon funds (and payments of related redemption proceeds) and semi-annual income distributions in an effort to preserve liquidity. Falcon has since suspended further investment and its activities are now limited to the Tender Offer, liquidation of the Company's assets, and winding-up the Company's affairs.

### The Tender Offer

15.    On May 8, 2008, the defendants commenced the Tender Offer and disseminated the Memorandum to investors. In connection with the Tender Offer, Falcon has offered to pay $0.45 cents for each share tendered by an investor, on the condition that the investor will tender all of his shares and unconditionally agree to release any actual or potential legal claim against any of the defendants, their affiliates and numerous third-parties (the "Release").[3] For each share tendered, Falcon will issue one share of a new class of limited liability company interest to Citigroup and/or its affiliated entities in exchange for a payment of $0.45 per share (*i.e.*, a price equal to the amount of consideration offered to members in the Tender Offer). The proceeds from the sale of these shares to Citigroup will be used to pay the investors who tendered their shares.

---

[3]    In addition, members who are "accredited investors" (as defined in Rule 501(a) of Regulation D under the Securities Act of 1933) may elect to receive a newly-issued "participation" share in addition to the offered consideration, although the Memorandum indicates that the ownership of such shares "is not likely to result in any appreciation or otherwise in a recoupment of [a member's] initial investment . . . ."

**The Memorandum is Materially Misleading**

16.    Defendants have asked Plaintiff and the other investors of Falcon to tender their shares on the basis of the Memorandum, which contains materially misleading statements and omissions of fact.

17.    One of the most glaring omissions in the Memorandum is the absence of any information permitting investors to accurately value their shares. While the Memorandum includes attachments that purport to ascribe a "net asset value" for each series of shares as of March 31, 2008, nowhere does the Memorandum provide *current* financial figures necessary to calculate the present value of the shares.  In fact, nowhere in the Memorandum do defendants actually disclose the manner in which they calculated the net asset value of the shares, nor the specific information that they utilized in doing so. Merely telling investors that a series of shares is worth $0.196 per share as of March 31, 2008 (in the case of Plaintiff's holdings), when the Memorandum is dated May 8, 2008 and the Tender Offer expires on June 30, 2008, does not provide investors with an accurate assessment of the true value of their shares *today*.  Nor does it provide investors with the means to calculate the value themselves. This information, however, is perhaps the most material to investors, who are being asked to tender their shares in lieu of attempting to recoup their losses by remaining as an investor in the Company during Citigroup's planned liquidation of the Company.

18.    A similarly glaring omission is the absence of any specific information regarding the nature or value of the Company's underlying assets, which are allocated to five strategies within the credit, residential mortgage-backed, asset-backed and municipal securities markets.  The only disclosure that the Memorandum makes regarding these assets is the approximate percentage of the portfolio that they occupied as of March 31, 3008:

> (i) relative value preferred securities (approximately 0.5% of total assets as of March 31, 2008), (ii) relative value fixed income (mortgage-backed securities and asset-

backed securities) (approximately 62.5% of total assets as of March 31, 2008), (iii) municipal arbitrage (approximately 11.2% of total assets as of March 31, 2008), (iv) opportunistic mortgage-backed securities (approximately 17.2% of total assets as of March 31, 2008) and (v) diversified asset-backed securities (approximately 8.6% of total assets as of March 31, 2008). Because of market illiquidity outside of preferred and municipal arbitrage securities, the Company's assets are as of the date of this Confidential Memorandum invested primarily in mortgage-backed and asset-backed securities.

Merely providing an approximate allocation of assets does not permit members to determine the value that each particular asset class contributes to the Company, nor whether the value of that particular group of assets is increasing or decreasing. In addition, because investors do not know the particular composition of the assets in each of these classes, they cannot determine whether the investment strategies may provide diversification benefits that their other investments do not.

19.    Another significant omission in the Memorandum is its failure to disclose sufficient information regarding the nature of the existing and potential claims covered by the Release, which precludes investors from determining what they have been asked to release. This disclosure deficiency compounds the lack of disclosure regarding the value of the Company's assets and shares, because investors must agree to the Release in order to participate in the Tender Offer, thereby releasing potentially valuable avenues of recourse against Citigroup and the other defendants in connection with the management of the fund.

20.    Moreover, in the Memorandum, defendants disclosed the existence of a putative class action that an investor of an affiliated fund, Falcon Strategies Two B LLC ("Falcon Two B"), commenced in the United States District Court for the Southern District of Florida against that fund, Citigroup and CAI. Although defendants did not mention it, that litigation was apparently voluntarily dismissed by the plaintiff on May 12, 2008, a mere four days after the Tender Offer was commenced and the Memorandum was disseminated to investors. Investors have not been provided

- 7 -

with any information regarding the resolution or discontinuation of that action, even though such information may very well bear on the propriety of any claims they may have against the defendants.

21.    In addition, defendants disclosed in the Memorandum that Citigroup "is currently responding to a U.S. regulatory inquiry relating to Falcon Two B, Citi, and certain other funds sponsored by, and entities affiliated with, Citi." Other than that general statement, however, the Memorandum fails to disclose any information regarding the nature and scope of the inquiry (including which regulatory authority initiated it), which particular funds are under investigation, and which other Citigroup entities are also a subject of the inquiry. Moreover, although the Memorandum indicates that Citigroup is responding to the inquiry, defendants have not disclosed any additional information regarding the inquiry, including the nature and content of its response. This information is not only material because it may provide further insight into whether investors have a valuable claim against Citigroup and the other defendants that they will be forced to waive if they participate in the Tender Offer, but it is also material because, since inception, Falcon has substantially invested in funds formed by Citigroup or run by CAI as investment manager. For example, as of the year ending December 31, 2007, Falcon had 98.81% of its assets invested in eleven funds affiliated with Citigroup and/or CAI – each one run by CAI as investment manager. In order for investors to know what claims they are releasing, they need more information regarding the investigation and the funds that are the subject of it, since those funds comprised nearly the entirety of Falcon's investments prior to its demise.

22.    Additionally, investors cannot determine for themselves whether the liquidation of those assets may generate proceeds that exceed the amount of the Tender Offer consideration. In this regard, the Memorandum notes that Citigroup will liquidate the Company's assets within twelve to eighteen months after the Company issues shares to Citigroup in connection with the Tender

- 8 -

Offer. The value of the assets in the portfolio may very well gain in value during that time, but investors do not have the information to determine how much.

23.    The Memorandum also misrepresents the events resulting in the drastic decline in value of the Company's shares. For example, the Memorandum indicates that Falcon was formed to serve as a multi-strategy fixed income alternative seeking to provide investors with absolute returns, current income and portfolio diversification. In actuality, however, Falcon employed quite risky investment strategies that failed to provide these benefits, resulting in the substantial decline of the investors' investments. The impact of these ill-suited investment strategies is perhaps best evidenced by the fact that Falcon now claims that the net asset value of nearly every series of shares has declined to approximately 20% of the initial capital invested.

24.    Moreover, the Company appears to have shifted away from its initial investment strategies – or at least the strategies that it claimed to follow. Indeed, the Memorandum indicates that "[b]ecause of market illiquidity outside of preferred and municipal arbitrage securities, the Company's assets are as of the date of this Confidential Memorandum invested primarily in mortgage-backed and asset-backed securities." Investors did not necessarily purchase shares in Falcon to invest in such securities.

25.    In addition, the Memorandum purports to describe the general market conditions that adversely affected the value of the underlying assets and hence the shares. At the same time, however, it fails to disclose what portion of the losses – or which losses, in particular – was the result of general market conditions as opposed to specific problems within a given market.

26.    And, the Memorandum misrepresents the purpose of the Tender Offer. Although the Memorandum represents that defendants have undertaken the Tender Offer "to create immediate liquidity" for investors, they fail to disclose that the primary reason they have initiated the Tender

- 9 -

Offer is to limit or entirely eliminate their liability by requiring investors who tender to agree to the Release. In this regard, the value of the Release itself likely far exceeds the offered consideration, but once again investors are not provided with the information to determine how much.

**The Tender Offer is Coercive
In the Absence of All Material Information**

27.    The Tender Offer is coercive because it requires members to tender their shares without all material information; it obligates Falcon to accept tendered shares only where the tender is accompanied by a broad general release of all claims; and it requires members to submit to arbitration in connection with their tender should any claims arise.

28.    First, in order to induce members to tender their shares, the defendants have structured the Tender Offer to permit members to tender their shares, and receive payment, prior to its expiration. This has the effect of prompting members to tender their shares on the basis of the misleading Memorandum, which fails to disclose all material information regarding the Tender offer, including the actual net asset value of each series of shares.

29.    Second, defendants have agreed to accept shares only from those members who agree to the Release. In other words, any members who refuse to waive potential or actual claims against any of the defendants and their representatives, but still wish to tender their shares, cannot do so. However, the scope of the Release is so wide-ranging that it extends to virtually anyone who has ever come into contact with the Company since its existence, including the following:

> . . . . the Company, the Investment Manager, the Company's advisory board, the selling broker for the Existing Shares, Citigroup Inc. and its subsidiaries (collectively, "Citi"), AMACAR GP, Inc. (the "Managing Member"), auditors and tax preparers of the Company, past and present sub-advisors of the Company, U.S. Bank National Association (the "Administrator") and past and present counsel (Cayman and U.S.) to such parties (such parties, and their respective employees, officers, directors, partners, counsel and agents of each of the aforesaid parties, past, present and future, and each of their respective "Affiliates" (as defined below), are

- 10 -

collectively referred to herein as the "Releasees"), as well as the Releasees' heirs, executors, administrators, successors and assigns . . . .[4]

30.     The Release is also unduly overbroad because it provides for the release of virtually any conceivable past, present or future claim against any of the parties for whom such claim is to be released.  Investors are thus given the illusory choice of accepting $0.45 per share in exchange for releasing any claim against anyone relating to the Company.

31.     Third, the Tender Offer is coercive because it is also conditioned upon the tendering members' acceptance of a broad arbitration clause, which merely serves as another way in which to preclude investors from asserting any claims against any of the defendants.

### Scienter Allegations

32.     Charged with the responsibility of running the day-to-day operations of the Company, CAI, its parent company Citigroup, and the actual manager of the fund, Islam, knew or recklessly disregarded the fact that certain of the investment strategies that they employed were ill-suited for Plaintiff and the other investors' investment goals or risk tolerances.  These defendants were also aware of changing market environments, and the risks that such changes posed, which could – and ultimately did – result in massive losses to the fund that could have been prevented had the fund not been so leveraged toward these markets.  Moreover, because AMACAR did not delegate all of its authority to manage Falcon to CAI, and could not delegate all of its management responsibility or the fiduciary duties it owes to investors, AMACAR is charged with knowledge of the inappropriate investment strategies that Citigroup, CAI and Islam pursued.

---

[4]     The Release defines the term "Affiliates" as "a person controlled by, controlling or under common control with another person (which shall include without limitation the Falcon Funds, as defined in the Confidential Memorandum, and Falcon Strategies LLC)," and the term "person" as "any individual person, corporation, trust, limited liability company, partnership, custodial or other account, contractual arrangement or any other juridical entity."

33.    Throughout their tenure in managing the fund, defendants gave investors the impression that their investments were conservatively managed, and that defendants were taking steps to insulate the investments from losses as a result of volatility in the marketplace. In a letter dated April 24, 2006 regarding Falcon's financial performance for the year ended December 31, 2005, CAI noted that "[m]unicipal arbitrage was the largest contributor to overall returns and cash flow, as municipal bonds outperformed taxables due to strong investor demand and declining supply, especially at year-end." As a result of the performance of these investments, CAI indicated that it "tactically increased the fund's allocation to Municipal Arbitrage, consistent with our views on interest rates and relative value expectations partially driven by the record levels of supply in those markets." As of December 31, 2005, 98.39% of Falcon's net assets were placed in eight funds affiliated with or run by Citigroup, CAI and/or Islam. CAI received management fees of nearly $2.1 million and an incentive allocation of nearly $1 million from the Company.

34.    By letter dated April 30, 2007 regarding Falcon's financial performance for the year ended December 31, 2006, Islam, on behalf of CAI, once against assured investors that their investments were safe even in light of increasingly volatile market conditions. For example, he indicated that "[o]verall for 2006, the fixed income markets were quite challenging and subject to a flat-to-inverted Treasury yield curve and a tight credit spread environment . . . By late summer, downward revisions in GDP, weaker manufacturing data, and softening in the housing market illuminated uncertainty about the U.S. outlook as it appeared economic momentum was beginning to ebb." In response, Islam noted that "we re-balanced our portfolio in the later part of 2006 by moving into *less volatile and more liquid strategies* in an attempt to give us more flexibility to exploit potential opportunities in 2007." [Emphasis added.] As part of the fund's outlook for 2007, Islam acknowledged the "downturn in the housing market" that began apparent "[n]ear the end of 2006,"

- 12 -

and noted that "[b]y 4Q2006, it appeared that business profitability may have already peaked and that economy-wide profit margins and balance sheets may be under pressure."

35.      In closing, Islam noted that although "market volatility will most likely remain elevated/increase," CAI was *reducing its cash positions* by increasing its exposure to such volatility:

> For this year, we anticipate continued relative value and trading opportunities within each of our substrategies. *First, we anticipate a challenging environment for certain mortgage-related securities.* Headline risks concerning the state of the housing market and economic uncertainties may technically impact spreads, despite our view that fundamentals appear sound. Second, we expect that the Treasury yield curve will normalize and steepen particularly on the short-end of the curve. Third, *market volatility will most likely remain elevated/increase given the extent of uncertainty around the economy, the upcoming Fed policy, and impact from a potentially steeper yield curve.* Although the timing and results of these factors are unclear, we anticipate that they should create additional investment opportunities relative to 2006. As opportunities may develop, *we plan to selectively decrease our cash positions by increasing exposure to select strategies including: Fixed Income Relative Value, Opportunistic MBS, Municipal Arbitrage, and Diversified ABS throughout the year.* [Emphasis added.]

As of December 31, 2006, 87.11% of Falcon's net assets were placed in nine funds affiliated with or run by Citigroup, CAI and/or Islam.  CAI earned management fees of nearly $2.4 million and an incentive allocation of approximately $4 million from the Company.

36.      By letter dated April 28, 2008 regarding Falcon's financial performance for the year ended December 31, 2007, the Company's auditor, KPMG, revealed that although the financial statements were audited under the assumption that Falcon would continue as a going concern, the Company's future was anything but certain:

> The Company is exposed to disruptions and uncertainties in the credit markets resulting in liquidity difficulties, raising costs of re-financing and an overall decline in the prices of asset holdings . . . These conditions . . . indicate the existence of a material uncertainty which may cast significant doubt about the Company's ability to continue as a going concern.  These financial statements do not include any adjustments that might result from the outcome of this uncertainty.

- 13 -

Even as of December 31, 2007, 98.81% of Falcon's net assets were placed in eleven funds affiliated with or run by Citigroup, CAI and/or Islam, four of which, as of April 15, 2008, the Company had "substantially redeemed all holdings" in. Nevertheless, CAI still earned management fees of more than $1.7 million and an incentive allocation of approximately $200,000 from the Company.

37. On April 28, 2008, *The Wall Street Journal* reported on the demise of the Falcon fund, providing, in pertinent part, as follows:

> The losses by the two hedge funds at issue, called Falcon and ASTA/MAT, are the latest examples of the credit crunch hammering retail, or individual, investors who believed they were holding low-risk securities.
>
> \*      \*      \*
>
> Last year, as Citigroup was gearing up to launch new Falcon and ASTA/MAT funds, it encouraged brokers at Smith Barney and in Citigroup's private bank to pitch the funds to their best customers. One reason for the push: Initial market tremors caused the Falcon family to decline by more than 10%, and Citigroup hoped to stabilize it with an infusion of cash.
>
> By September, the new Falcon fund had raised about $71 million. A new ASTA/MAT fund raised about $800 million. Both new funds were heavily comprised of retail investors.
>
> Citigroup brokers and fund managers assured prospective investors that the new hedge funds were low-risk, with Falcon likely to post losses of no more than 5% a year in the worst-case scenario, according to people familiar with the situation.
>
> "That's why they bought it," says a Smith Barney broker whose clients, many of them wealthy retirees, invested in the Falcon fund. "These kinds of clients weren't looking for a home run."
>
> \*      \*      \*
>
> As of March 31, the new Falcon fund was worth just 25% of its initial value, according to internal documents. The ASTA/MAT fund had shriveled by Feb. 29 to less than 10% of its original value, the documents show. *Even as their performances deteriorated, Reaz Islam, the 41-year-old manager of the funds, reassured uncertain brokers and clients that the funds were likely to rebound, according to people familiar with the matter.* [Emphasis added.]

- 14 -

38.     As demonstrated above, defendants knew or had reason to know that the markets were becoming increasingly volatile, yet they invested Falcon's assets in strategies that exposed the Company to further losses anyway, in contravention of the Company's stated investment strategies and the investors' known investment goals and risk tolerances.

39.     Moreover, defendants were charged with the responsibility of managing the Company's operations and investments and apprising themselves of all material information regarding same, and they have used this information to generate management and incentive fees for themselves in furtherance of a scheme to acquire the outstanding shares of Falcon without disclosing all material information to investors regarding, *inter alia*, the value of the shares or the underlying assets, the purpose for the Tender Offer, the circumstances surrounding the ongoing regulatory investigation, and the Release.

40.     In addition, defendants acted with scienter insofar as they knew or recklessly disregarded that the Memorandum contains materially misleading statements and omissions, and they participated or acquiesced in its preparation and dissemination. At all relevant times, each of the defendants occupied a position of power and control over the Company and/or the Tender Offer, and had the ability to issue statements on the Company's behalf or the opportunity to participate in the Company's formulation and dissemination of statements to investors. Defendants also have and had access to internal and other non-public information regarding the Company's operations. In knowing or reckless disregard of the true facts concerning the Company, the defendants prepared and disseminated the Memorandum. They were thus active participants in the fraud alleged herein, which the defendants have pursued in order to induce investors to agree to the Release; facilitate Citigroup's takeover of the Company; and liquidate the Company for their own benefit to the detriment of investors.

- 15 -

## CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action as a class action on behalf of itself and those members who have tendered or are being asked to tender their shares to Falcon in connection with the Tender Offer. Excluded from the Class are defendants, the current and former officers and directors of any of the defendants, and, with respect to any of the foregoing, the members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

42.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Citigroup or its transfer agents and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. Falcon issued nine series of millions of dollars worth of shares.

43.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected, although possibly to different degrees, by defendants' wrongful conduct in the violation of federal and Delaware law.

44.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are: whether defendants violated the Exchange Act and/or breached fiduciary duties owed under Delaware law; whether the Memorandum omits and/or misrepresents material facts about the value of the shares, the nature and value of the Company's

- 16 -

assets, the purpose and scope of the release that defendants have required as a condition of accepting any tendered shares, and other matters related to the Tender Offer; and to what extent the members of the Class have sustained damages and the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small when viewed individually in the context of the Tender Offer, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

47.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

48.     The Memorandum, which defendants disseminated to Falcon's members in connection with the Tender Offer, contained false and misleading statements and omissions of material fact in violation of Section 10(b) and Rule 10b-5.

49.     Defendants knew or recklessly disregarded that the Memorandum contained these statements and omissions, and nevertheless failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.     Plaintiff and the other investors did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Memorandum.

- 17 -

51.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class cannot make an informed decision about whether to tender their shares in connection with the Tender Offer.

52.     Defendants must be compelled to disclose additional information to Plaintiff and other investors in order to permit them to make an informed decision.

53.     By reason of the conduct alleged herein, the defendants have violated Section 10(b) and Rule 10b-5 and will continue to do so unless and until the Tender Offer is enjoined by the Court and they are required to issue supplemental and/or corrective disclosures to the members of the Class.

## COUNT II

### For Violation of Section 14(e) of the Exchange Act
### Against All Defendants

54.     Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

55.     The Tender Offer is subject to Section 14(e) of the Exchange Act, which makes it unlawful "to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer . . . ."

56.     The Memorandum, which defendants disseminated to Falcon's members in connection with the Tender Offer, contained false and misleading statements and omissions of material fact in violation of Section 14(e).

57.     Defendants knew or recklessly disregarded that the Memorandum contained these statements and omissions, and nevertheless failed to disclose material facts necessary in order to

make the statements made, in light of the circumstances under which they were made, not misleading.

58.    Plaintiff and the other investors did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Memorandum, and, as members of the Company subject of the Tender Offer, they require the protection of Section 14(e).

59.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class cannot make an informed decision about whether to tender their shares in connection with the Tender Offer.

60.    Defendants must be compelled to disclose additional information to Plaintiff and other investors in order to permit them to make an informed decision.

61.    By reason of the conduct alleged herein, the defendants have violated Section 14(e) and will continue to do so unless and until the Tender Offer is enjoined by the Court and they are required to issue supplemental and/or corrective disclosures to the members of the Class.

## COUNT III

### Claim for Breach of Fiduciary Duties and/or Aiding and Abetting Breach of Fiduciary Duty Under Delaware Law Against All Defendants

62.    Plaintiff repeats and realleges the allegations set forth above in paragraphs 1 through 46 as if set forth fully herein.

63.    By attempting to induce investors to tender their shares on the basis of the materially misleading Memorandum, defendants have violated the fiduciary duties of care, loyalty, candor and good faith owed to these investors under Delaware law.

64.    Moreover, in drafting and disseminating the Memorandum, defendants have unfairly utilized confidential information regarding Falcon to their advantage and to the detriment of the

- 19 -

investors, who are being asked to tender their shares on the basis of such incomplete and misleading information.

65. In the absence of injunctive relief requiring defendants to issue supplemental and/or corrective disclosures to members, and enjoining defendants from proceeding with the Tender Offer and accepting any tendered shares, members will be irreparably harmed because they will be forced to determine whether to tender their shares in connection with the Tender Offer on the basis of the materially misleading statements and omissions of fact contained in the Memorandum. Members will thus be required to make a determination of whether to relinquish their interest in the Company on the basis of inadequate information, a situation created by defendants' violation of the fiduciary duties of care, loyalty, candor and good faith owed to such members.

66. Members will also be irreparably harmed without the required additional information because, as a condition of tendering their shares, they are required to accept the Release, which purports to eliminate any legal claim such members may have against any of the parties involved in operating the Company. Investors must similarly agree to arbitrate any claim that they may have, which will also serve as an impediment to their right to bring a claim against defendants should they so choose.

67. In addition, to the extent that any of the defendants do not directly owe fiduciary duties to the investors, they aided and abetted the breaches of fiduciary duty alleged herein by the other defendants that owe such duties.

68. As a result of the actions of the defendants, plaintiff and the Class have been and will be irreparably harmed in the absence of injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

- 20 -

    A.      Determining that this action is a proper class action and certifying plaintiff as Class representative;

    B.      Enjoining defendants, and any person or entity affiliated with them, from proceeding with any aspect of the Tender Offer or any attendant transaction thereto, including the acceptance of any tendered shares and the payment for such shares or the issuance of shares to Citigroup, until such time as Defendants disseminate all material information relating to the Tender Offer to Falcon's investors;

    C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    D.      Awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

### JURY DEMAND

    Plaintiff hereby demands a trial by jury.

DATED: May 20, 2008          COUGHLIN STOIA GELLER
                          RUDMAN & ROBBINS LLP
                      SAMUEL H. RUDMAN
                      ROBERT M. ROTHMAN
                      JOSEPH RUSSELLO

                      SAMUEL H. RUDMAN

                      58 South Service Road, Suite 200
                      Melville, NY 11747
                      Telephone: 631/367-7100
                      631/367-1173 (fax)

- 21 -

COUGHLIN STOIA GELLER
 RUDMAN & ROBBINS LLP
DARREN J. ROBBINS
DAVID C. WALTON
DAVID T. WISSBROECKER
655 West Broadway, Suite 1900
San Diego, CA  92101-3301
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

DAVID P. FERGUSON, on behalf of David P. and Marguerite M. Ferguson Trustees, Ferguson Family Trust UDT November 24, 1999 ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

Acquisitions:

| Date Acquired | Cost of Falcon Shares Acquired |
|---|---|
| March 1, 2005 | $500,000 + fees |
|  |  |
|  |  |

Sales:

| Date Sold | Proceeds of Falcon Shares Sold |
|---|---|
| N/A |  |
|  |  |
|  |  |

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

FALCON

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _14th_ day of _May_, 2008.

DAVID P. FERGUSON, Trustee

- 2 -

FALCON